Harold C. ABRAMSON, Trustee for Casco Chemical Corporation, Bankrupt, Appellant,

v.

Waller C. BOEDEKER, Appellee.

UNITED STATES of America, Appellant,

v.

Harold C. ABRAMSON, Trustee for Casco Chemical Corporation, Bankrupt et al., Appellees.

No. 23127.

United States Court of Appeals Fifth Circuit.

June 23, 1967.

Rehearing Denied Aug. 15, 1967.

James R. Alexander, Philip I. Palmer, Jr., Palmer, Green, Palmer & Burke, Dallas, Tex., for appellant Abramson.

Richard M. Roberts, Acting Asst. Atty. Gen., Lee A. Jackson, Joseph Kovner, Donald W. Williamson, William Friedlander, Jeanine Jacobs, Attys., Dept. of Justice, Melvin M. Diggs, U. S. Atty., Dallas, Tex., Mitchell Rogovin, Asst. Atty. Gen., Washington, D. C., for the United States, William E. Smith, Asst. U. S. Atty., of counsel.

Robert F. Ritchie, Ritchie, Ritchie & Crosland, Carswell H. Cobb, Dallas, Tex., for appellee, Waller C. Boedeker.

W. E. Smith, Asst. U. S. Atty., Dallas Tex., for intervenor.

Before BROWN, COLEMAN, and AINSWORTH, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Unlike their military counterparts, many cases neither die nor fade away. They simply go on. Cf. Bros, Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1965, 351 F.2d 208, 209, note 1, cert. denied, 1966, 383 U.S. 936, 86 S.Ct. 1065, 15 L.Ed.2d 852. So it is here. Now back from a denial of relief on the merits after an earlier reversal for trial, In re Casco Chemical Co., 5 Cir., 1964, 335 F.2d 645, an intervening appeal which effectually reduced the amount of the Government's tax lien, Cash v. Campbell, 5 Cir., 1965, 346 F.2d 670, and a similar action ending adversely to the trustee in Kansas,[1] we must decide the merits.

The immediate question is whether the Trustee in Bankruptcy for Casco, through stepping into the shoes of one or more of three actual existing creditors is entitled to set aside distribution of funds due the Bankrupt for goods sold by it. This turns on several subsidiary questions. The first is whether the date of bankruptcy is the date of filing the original petition (October 4, 1961), or the date of the amended petition filed more than four months thereafter on February 26, 1962. If the latter, all washes out with the possible exception of the Government's tax lien. If the earlier date prevails, several questions arise under Texas law and its accounts receivable notifica-

---

1. See the unpublished opinion of Judge Wesley E. Brown, U.S. District Judge, Abramson, Trustee v. Excel Packing Co., Inc., D.C.Kan., W-2976, September 22, 1966. We are informally advised that subsequent to the judgment and the Trustee's notice of appeal in November 1966, the appeal to the Tenth Circuit was pursuant to the Trustee's stipulation of March 15, 1967, dismissed on March 21, 1967.

tion act.[2] The first is whether the debt was a covered account receivable, not an excluded debt represented by a negotiable instrument. Second, if covered, the question is whether the failure to record the statutory notice subordinates the unrecording assignee to subsequent liens. We answer all in favor of the Trustee (and Government) and reverse.

## I.
### Date of Bankruptcy

For this and the other problems no purpose is served in repeating in detail the facts set out in our prior opinion. 335 F.2d 645, 646–648. The facts before the trial Court and on this appeal are drawn from a stipulated record. On October 5, 1961, the consent order was entered by the District Court which gave rise to the asserted vulnerable transactions. (Notes 11, 12, 335 F.2d 645, 647). The day before, October 4, 1961, an involuntary petition in bankruptcy was filed by one creditor which alleged three acts of bankruptcy in conclusory general terms.[3] On February 26, 1962, more than four months after October 5, 1961, an amended petition was filed which in factual detail set forth the interpleaded judgment of October 5, 1961, and the transfer of the sums to the four named claimants.[4] This was followed by the formal withdrawal of the defense by Casco, the Bankrupt, and an adjudication by agreement and default.

Reaching the conclusion that a plenary action, not summary proceeding, was required, the District Court earlier held, 335 F.2d 645, Part II, 648–650, that the date of bankruptcy was October 4, 1961, not the date of the amendment, February 26, 1962. In affirming lack of summary jurisdiction, we held that the date of bankruptcy was a matter for determination in the plenary proceedings to be held on remand, 335 F.2d 648. On the remand, the District Court changed its view and held that the date of bankruptcy was February 26, 1962, not the date of the original petition.[5]

Although the parties and the Court below persist in discussing this problem in terms of the doctrine of relation back, see 2 Collier, Bankruptcy ¶ 18.23 and ¶ 18.26 (14th ed. 1966), the answer cannot be found there. For it is perfectly obvious whether on general principles or on F.R.Civ.P. 15(c) that allegations concerning events occurring subsequent to the filing of the original petition cannot possibly relate back to the earlier date of filing. But that is a long way from an enforced conclusion that the date of bankruptcy here must have been the date of the amended petition.

■■■■ It is true, of course, that to initiate an involuntary proceeding, one of the six specified acts of bankruptcy must have occurred within four months prior to the filing of the petition. § 3, 11 U.S.C.A. § 21. But once a single

---

2. Tex.Rev.Civ.Stat.Ann. art. 260–1, "Accounts and accounts receivable; notices; records." This provision was repealed effective June 30, 1966, Acts 1965, 59th Leg., vol. 2, p. 1, ch. 721, § 10–102. It is now covered by the Uniform Commercial Code. See note 14, infra.

3. Paragraph 6: "Within four months next preceding the filing of this petition the said Casco Chemical Company committed an act of bankruptcy in that:
   "(a) Made or suffered transfers of its property fraudulently under and within the meaning of Section 67d of the Bankruptcy Act [11 USCA § 107d(2)].
   "(b) It has concealed its assets with intent to hinder, delay or defraud its creditors [11 USCA § 107d(2) (d)].

"(c) Made and suffered preferential transfer as defined in Subdivision (a) of Section 60 of the Bankruptcy Act [11 USCA § 96a]."

4. This included Excel Packing Co., Superintendence Company, Inc., McRedmond Bros., Inc., and Waller C. Boedeker. Boedeker, who had guaranteed the payment of Casco's indebtedness to the Bank, discharged the debt and received an assignment of all of the Bank's claims against Casco. References herein to the Bank or to the Assignee, therefore, refer to the interest of Boedeker as well.

5. This was likewise the holding of Judge Wesley E. Brown in the Kansas proceeding against Excel, see note 1, supra.

act of bankruptcy has occurred and the petition has been timely filed with adequate allegations, the power of the Trustee acting for the general estate to reach back and unscramble transactions which are vulnerable to specific sections of the Act, e. g., §§ 67, 70, etc., is not restricted to those transactions occurring within the four months' prefiling period.[6] More important, neither is it restricted to those specific transactions set forth in the involuntary petition. In other words, a single act of bankruptcy adequately alleged—no matter how insignificant in terms of dollars or relation to other unalleged suspect transactions— triggers the whole thing.[7]

■■ Phrasing the problem as we do, whether the allegations of the involuntary petition are adequate is essentially a question of procedure. Through General Order 37[8] this brings directly into play the Federal Rules of Civil Procedure "in so far as they are not inconsistent with the Act or with [the] general orders." 1 Collier ¶ 2.81; Georgia Jewelers, Inc. v. Bulova Watch Co., 5 Cir., 1962, 302 F.2d 362, 366. Except that § 18c, 11 U.S.C.A. § 41, requires that "petitions for both voluntary and involuntary bankruptcy shall be verified under oath," 2 Collier ¶ 18.36, nothing in General Order 5 prescribing the content and form of the petition nor in the official forms, see General Order 38, is inconsistent with F.R.Civ.P. 8(a)(2) which requires mere-

ly a "short and plain statement," the standard under 8(e) being that each "* * * averment of a pleading shall be simple, concise, and direct." See 2 Collier ¶ 18.09[2.2], citing 2 Moore, Federal Practice, ¶ 8.12, it should "be noted that * * * [Rule 8(a)(2)] does not require the pleading of facts as distinguished from conclusions of law." There is no reason, therefore, why the involuntary petition should not be read with all of the liberality of the usual civil complaint. Conley v. Gibson, 1957, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80; Georgia Jewelers, Inc. v. Bulova Watch Co., supra, 302 F.2d at 366; Barber v. Motor Vessel "Blue Cat", 5 Cir., 1967, 372 F.2d 626, and see especially cases cited p. 627, n. 1.

Consequently, as Collier points out, despite the sometime use of the term "jurisdictional facts" as a basis for a particular procedural ruling, deficiencies in pleadings cannot really be "jurisdictional." "There is no basis for assuming that the pleading of an act of bankruptcy, for instance, is any more 'jurisdictional' than the pleading of a petitioning creditor's claim. Nor is it reasonable to suppose, on reading the Act and the General Orders, that a given defect in pleading might be 'jurisdictional' * * * at one stage of the proceedings, and 'non-jurisdictional' at a subsequent stage. Far more preferable is the view that defects in pleadings are not 'jurisdictional'; that wheth-

---

6. Some transactions are, of course, vulnerable for four months only. See, e. g., second act of bankruptcy under § 60, 11 U.S.C.A. § 96; 1 Collier, Bankruptcy, ¶¶3.201, 3.202 (14th ed., 1966).

  The trustee's powers under other sections of the Act are not so restricted: "Section 70e(1) prescribes no conditions or time limits within which transactions are deemed voidable. It merely incorporates the applicable state or federal law in this regard. Consequently, the four months' or one year's limitations established in §§ 60 and 67 are inapplicable in a suit under § 70e." 4 Collier ¶70.71 at 1547; Blackford v. Commercial Credit Corp., 5 Cir., 1959, 263 F.2d 97, 110. See also § 11, 11 U.S. C.A. § 29, minimum 2-year statute of limitation.

7. In this sense, at least, the petition serves as even less notice than the generalized complaint (F.R.Civ.P. 8(a) and forms 8 & 9). The "right" of a creditor to hang on to his self-help priority may not, therefore, be equated with concepts of fair notice from pleadings.

8. General Order 37: "In proceedings under the Act the Rules of Civil Procedure for the District Courts of the United States shall, in so far as they are not inconsistent with the Act or with these general orders, be followed as nearly as may be. But the court may shorten the limitations of time prescribed so as to expedite hearings, and may otherwise modify the rules for the preparation or hearing of any particular proceeding." 11 U.S.C.A. following § 53.

er or not they may be cured depends upon the power of amendment, and that a bankruptcy court has ample jurisdiction to permit amendments." Serving as a prelude for our further discussion, the text concludes, "Aside from a few isolated instances, juridical opinion amply supports these views." 2 Collier ¶ 18.05 at p. 20.

■ But in considering the cases, a distinction must be kept carefully in mind. The fact that the Bankruptcy Court on a timely objection made by the debtor-alleged-bankrupt concludes that the allegation of the act of bankruptcy is not factually detailed enough and that therefore an amendment is required in the interest of good orderly administration, is not the equivalent of a holding that the petition is so totally defective that it is a nullity, the jurisdiction of the court has never been invoked, and the critical times have not begun to run.[9]

■■ The key is the defensive position taken by the debtor-alleged-bankrupt. This is surely so ever since the 1938 Amendments [10] which took away from creditors the right to contest an involuntary petition. This was a deliberate congressional choice to avoid abuses arising from the self-interest of creditors seeking by procedural or other objections to hang on to self-help preferences which were otherwise vulnerable. 2 Collier ¶ 18.33. Since the creditor cannot oppose the petition directly, he ought not to have the right to gain the same benefit through a collateral attack.[11]

■ Against this background we align ourselves with the First, Second, Third, Seventh and Eighth Circuits in holding that allegations in the wording of the statute, although vulnerable to objection by the debtor-alleged-bankrupt thus setting in train questions of relation back of proffered amendments, are not "jurisdictionally" defective. √

Thus, in Commercial Credit Corp. v. Skutt, 8 Cir., 1965, 341 F.2d 177, where the petition was challenged as "so fatally defective" on its face as to deprive the Bankruptcy Court of jurisdiction, the Eighth Circuit has this to say. "This contention overlooks the fact that the Congress, not the pleadings, vests the District Court with the power or right to

---

9. Of course the expressions are frequently that allegations in the words of the statute are insufficient.

See, e. g., 2 Collier ¶18.11, quoting from Matter of Hark, D.C.Pa., 135 F. 603: "There is one rule, however, followed by all courts—that allegations of acts of bankruptcy in a petition in the language of the act, without setting forth any other facts or circumstances, are insufficient." See also 1 Collier ¶3.106 at pp. 422, 424; ¶3.207 at pp. 452–53; 2 Collier ¶18.26 at pp. 70–71.

10. Prior to the 1938 Amendments § 18b, 11 U.S.C.A. § 41(b), read:

"18b. The bankrupt, or any creditor, may appear and plead to the petition within five days after the return day, or within such further time as the court may allow." See 2 Collier ¶18.01, p. 8, n. 12.

11. 2 Collier ¶18.26, p. 69: "It was held, prior to the Act of 1938, that the doctrine of relation back would not be applied to the prejudice of creditors contesting adjudication on a defective petition * * *. Under § 18b of the 1938 Act, however, creditors may no longer

contest the involuntary petition. It seems, therefore, that where the bankrupt in such a case consents to an amendment to allege a new act of bankruptcy, the amendment should relate back to the date of the original petition. It would appear as unwarranted benevolence for a court to refuse application of the doctrine of relation back to protect liens or preferences in behalf of the creditors to whom the Bankruptcy Act has denied the right to contest adjudication on an involuntary petition."

Indeed, even prior to the 1938 Amendment the bankrupt's action was controlling.

"If the bankrupt consents to the amendment it will relate back to the date of the original petition, even where a creditor, affected by the amendment, objects thereto. This is illustrated in International Silver Co. v. New York Jewelry Co., [6 Cir., 1916, 233 Fed. 945] decided by the Sixth Circuit and impliedly approved by the Second [citing Matter of Fuller, 2 Cir., 1926, 15 F.2d 294] and Eighth [citing Hovland v. Farmers State Bank of Christine, 8 Cir., 1926, 10 F.2d 478] Circuits." 2 Collier ¶18.26 at p. 72.

act in bankruptcy proceedings. In the instant case, the District Court had jurisdiction of the subject matter by virtue of the federal bankruptcy act. * * *. A defective petition in bankruptcy presents no different problem from a defective complaint generally. It does not deprive the court of jurisdiction and is subject to amendment." 341 F.2d at 180, 181. Similarly, Chief Judge Lumbard, after recognizing that an allegation of an act of bankruptcy in the statutory language "is improper [since] a reasonably higher degree of particularity is required in an involuntary petition * *" made plain for the Second Circuit its stand on "jurisdiction." "It is clear that the defects in the petition were not jurisdictional so as to require an outright dismissal and that the District Court had the power to allow amendment of the petition so that defects in pleading could be cured." South Suburban Safeway Lines, Inc. v. Carcards, Inc., 2 Cir., 1958, 256 F.2d 934. This was echoed by him in Minkoff v. Steven Jrs., Inc., 2 Cir., 1958, 260 F.2d 588, 589–590, where the Court declared that "merely pleading in broad terms does not amount to failure to state a claim, especially when as here the generality of the pleading arises from the use of the statutory language." Long before, the Third Circuit had likewise said "The fact that the acts of bankruptcy were set out merely in the language of the Bankruptcy Act is no ground for dismissing the petition * * *," Kay v. Federal Rubber Co., 3 Cir., 1930, 46 F.2d 64, 65, as had the First Circuit about the same time in these simple direct words, "The defect was not jurisdictional." Harney Shoes, Inc. v. National Fabrics & Finishing Co., 1 Cir., 1937,

44 F.2d 517, 518. More recently the Seventh Circuit, citing Harney sounded the same views. Bixby v. First National Bank, 7 Cir., 1957, 250 F.2d 713. And we agree with the Seventh Circuit's reading of our early case, In re Louisell Lumber Co., 5 Cir., 1913, 209 F. 784, of which the Court had this to say. "The weakness of defendant's position is emphasized by its reliance upon In re Louisell Lumber Co. * * * Defendant fails to discern that in the Louisell case there was no defective statement of an act of bankruptcy. Instead, there was a complete absence of an allegation of any act of bankruptcy." Bixby v. First National Bank, supra, 250 F.2d 713 at 718.

Whatever might have been the case had the debtor persisted in denial of bankruptcy,[12] when the debtor here withdrew his answer and acquiesced in adjudication by default,[13] the date of bankruptcy was fixed as of the date of the original petition. The District Court was in error in finding to the contrary.

## II.
### Status of the Debt as an Account Receivable

Under the arrangement between Casco and the Bank, Casco would make out its invoice for goods sold to Bunge. Casco then drew a draft on Bunge with the attached invoice covering the goods sold. After first verifying each transaction with Bunge, the Bank then purchased each invoice-draft from Casco for its face amount. For the period of time between payment by the Bank of the funds to Casco until acceptance of the draft and payment by Bunge to the Bank's correspondent, the Bank charged, and Casco paid, eight per cent interest.

12. Propriety of amendment frequently turns on questions of relation back. Under the policies of the Rules and particularly F.R.Civ.P. 13(c), the Second Circuit has liberalized its approach over many older cases so heavily pressed here by the Bank. See Glint Factors, Inc. v. Schnapp, 2 Cir., 1942, 126 F.2d 207; cf. Dworsky v. Alanjay Bias Binding Corp., 2 Cir., 182 F.2d 803; Matter of Ideal Mercantile Corp., 2 Cir., 1957, 244 F.2d 828, cert. denied, 1957, 355 U.S. 856, 78 S.Ct. 84, 2 L.Ed.2d 63.

13. The Second Circuit has several times emphasized the waiver of objections or defenses from failure to assert them under F.R.Civ.P. 12(h). See Minkoff v. Stephen Jrs., Inc., 2 Cir., 1958, 260 F. 2d 588; South Suburban Safeway Lines, Inc. v. Carcards, Inc., 2 Cir., 1958, 256 F.2d 934; In re S. W. Straus & Co., 2 Cir., 1933, 67 F.2d 605.

Each draft showed an endorsement by Casco, the drawer, to the Bank. 335 F.2d 645, 656.

The Bank argues that this assignment, prior in time was prior in right, because Art. 260–1, the Texas non-notification accounts receivable recording statute (see note 2, supra), expressly excludes from the statutory definition of an "account receivable" any debt in which the "right to payment is * * * represented by * * * a negotiable instrument * *." [14]

A faint argument is made that as expressly declared in Inland Refining Co. v. Robinson, 1953, 152 Tex. 289, 291, 256 S.W.2d 843, a draft is not a negotiable instrument until it is accepted. But we place no reliance on this decision which must be regarded as suspect in view of the clear terms of the Texas NIL, § 126, Tex.Rev.Civ.Stat.Ann. art. 5940.

■■■ From the whole transaction it is perfectly plain that payment was not represented by these drafts. Bunge had received the goods. Casco looked to Bunge for payment for the goods. Receipt of the goods at the prices and quantities specified in the invoices gave rise to an implied, if not an express, obligation to pay for them. But Bunge had no liability on the drafts. Texas NIL § 127, Tex.Rev.Civ.Stat.Ann. art. 5940; 9 Tex.Jur.2nd, Bills and Notes § 125. Bunge became liable on the drafts only upon acceptance which, being sight drafts, meant on payment. Of course

the drawer, Casco, remained liable on its warranty on the drawee's failure to accept (or pay), Texas NIL § 61, Tex.Rev.Civ.Stat.Ann. art. 5936, § 61. But there is nothing to indicate here that the Bank was content to rely solely upon the secondary liability of the drawer Casco. On the contrary, the security instruments, Boedeker's guaranty given to the Bank, and the Bank's State Court suit against Bunge which ultimately became the federal interpleader's action, 335 F.2d 645 at 647, all combine to demonstrate that the Bank, whether as purchaser or pledgee, or both, treated as the transferred indebtedness Bunge's obligation to pay, Casco's right to receive, the invoice value of the goods.

The assignment to the Bank was therefore subject to Art. 260–1.

### III.
### Effect of Failure to Record Bank's Assignment

On the assumption that Art. 260–1 applies to this assignment, the Bank next argues that the purpose of the statute is clearly to protect assignees only. The failure to record gives no protection to subsequent attaching or garnishing creditors (i. e., Superintendence) or to statutory lien holders (i. e., the Government).[15]

■■■ Since the Trustee has only to avoid the Bank's assignment as to one actual creditor under § 70e, 11 U.S.C.A. § 110e,[16] this contention is hardly avail-

---

14. Art. 260–1, § 1. "In this Act, unless the context otherwise requires:
  "(1) 'Account' or 'account receivable' means an existing or future right to the payment of money presently due, or to become due (a) under an existing contract or under a future contract entered into during the effective period of the notice of assignment * * *; (b) which right to payment is not secured by a chattel mortgage * * * or other instrument which may be filed for record * * *; and (c) which right to payment is not represented by (A) a judgment, (B) a negotiable instrument, * * *."

15. The Government's tax claims were assessed beginning January 22, 1960, and extending through February 3, 1961. Statutory lien notices were filed between April 12, 1960, and April 7, 1961.

16. The Trustee's § 70e powers can lead to some weird Tinker-to-Evers-to-Chance successive avoidance of transfers. See Cherno v. Dutch American Mercantile Corp., 2 Cir., 1965, 353 F.2d 147; In re Baumgartner, 7 Cir., 1931, 55 F.2d 1041; cf. Bergin v. Waterson, 10 Cir., 1960, 279 F.2d 193. Mixing the figuratives a bit more, the Eighth Circuit characterizes the position of the trustee as standing "in the shoes of the bankrupt," but also in the overshoes of the creditors * * *. Schneider v. O'Neal, 8 Cir., 1957, 243 F.2d 914, 918.
  In any event if the transfer is avoidable at all by any creditor, it is avoidable in full for all creditors regardless of the dollar amount of the prevailing claim. Moore v. Bay, 1931, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133; Roscoe Moss

ing. This is so because Excel (335 F.2d 645, 646, note 7, 12) obtained a formal assignment of a part of the same Bunge indebtedness on November 17, 1959, and it was recorded the next day, November 18, in Dallas. Excel's assignment, as a protected assignment, made the Bank's unrecorded assignment voidable.[17]

We reject altogether as completely unfounded in this stipulated record the District Court's holding that Excel did not take the protected assignment "in good faith" within the meaning of § 6, note 17, supra. Because the Excel assignment was taken in payment of, or to secure, a pre-existing debt, the Court mistakenly reasoned that since this would disqualify one as a bona fide purchaser for value and without notice[18] this meant that Excel was not in "good faith." "Good faith" is only one of three requirements necessary in order for one to be a BFP of realty, the question involved in the cases cited note 18, supra, and an antecedent debt can constitute valuable consideration for an assignment, Quinn v. Dupree, 1957, 157 Tex. 441, 303 S.W.2d 769.

The Excel assignment being protected, the Bank's assignment is voidable as to it, and this alone would be sufficient. But in view of the holdings in the Kansas case (see note 1, supra) which might give rise to some notions of collateral estoppel

as to the Excel assignment triggering the Trustee's recovery, we think it clear that the Bank's assignment was equally, if not more so, vulnerable to the Superintendence attachment[19] and the Government's tax lien.

For this we take our signal from the Texas Courts. And from Parker Square State Bank v. Triangle Supply Co., Tex.Civ.App., 1963, 364 S.W.2d 418 (writ ref'd n. r. e.) it comes in loud and clear. That Court considered in detail the question whether a lien creditor who acquired his lien after delivery of a valid written assignment of accounts acquired a right to the funds superior to that of the assignee where the assignee, as true here, had not filed notice of the assignment under the recording statute. The Court had this to say. "Article 260–1 does not so clearly provide that an assignee's failure to record enables a creditor to establish superior rights by garnishing the account, or otherwise fixing a lien, but we think such was its purpose. * * * [T]he trial court correctly held that the rights of the appellants as to the accounts [as to] which they failed to file notice of their assignments were inferior to the rights of subsequent lien creditors." 364 S.W.2d 418 at 423.

The Bank tries here, as the banks did in Parker Square, 364 S.W.2d at 423, to convince the Court that *Parker Square*

Co. v. Duncan, 9 Cir., 1964, 336 F.2d 670; In re Plonta, 6 Cir., 1962, 311 F. 2d 44; Levine v. Johnson, 5 Cir., 1961, 287 F.2d 623; Corley v. Cozart, 5 Cir., 1940, 115 F.2d 119.

17. Art. 260–1, § 6. "Whenever any person * * * shall in good faith take a *protected* assignment of any account or accounts, * * * all creditors of, and all subsequent assignees, purchasers and transferees of or from the assignor shall be conclusively deemed to have received notice of such assignment * * *; and and after such filing for record, no purchaser from the assignor * * *, and no prior or subsequent assignee or transferee of the assignor, holding an assignment not protected * * * shall in any event have * * * any right in the

account * * * so assigned or in the proceeds thereof * * * superior to the rights therein of the assignee named in such prior protected assignment."

18. The trial Judge cited Hopper v. Tancil, Tex.Com.App., 1928, 3 S.W.2d 67; La Brie v. Cartwright, 1909, 55 Tex.Civ. App. 144, 118 S.W. 785 (no writ hist.); Sparks v. Taylor, Tex.Civ.App., 1905, 87 S.W. 740, reversed, 1906, 99 Tex. 411, 90 S.W. 485, 6 L.R.A.,N.S., 381.

19. See note 1, supra. Judge Wesley Brown held that the Superintendence attachment, having been levied on the same day as the execution of Excel's assignment, November 17, 1959, which was not perfected until recorded the following day, November 18, primed Excel's assignment.

conflicts with the Supreme Court's earlier decision in Quinn v. Dupree, 1957, 157 Tex. 441, 303 S.W.2d 769. Our unwillingness to make a non-*Erie* reading gains some support, we think, from the Court's rejection over the strong dissent of Judge Hughes of the same argument in South Main State Bank v. State of Texas, Tex. Civ.App., 1963, 365 S.W.2d 946, writ ref'd n. r. e. Nor on this record are these considerations altered by United States v. Ray Thomas Gravel Co., Inc., Tex.Civ. App., 1963, 373 S.W.2d 333, reversed, Tex., 1964, 380 S.W.2d 576.[20]

■ And, of course, to the attachment lien of Superintendence there may also be added the Government's tax lien, 26 U.S.C.A. §§ 6321, 6322, 6323.

The upshot of it is that the Government, Superintendence and Excel had rights superior to the Bank's earlier non-recorded assignment. That is all the Trustee needed. So this case must now go back for the entry of a judgment requiring the Bank's assignee Boedeker to pay to the Trustee[21] the amount received by him. As with another tenacious case, Bros Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1965, 351 F.2d 208, 209, note 1, cert. denied, 1966, 383 U.S. 936, 86 S.Ct. 1065, 15 L.Ed.2d 852, this multi-Circuit litigation ends with diverse results in the 5th and 10th Circuits, see notes 1, 19, supra.

Reversed with directions.

20. In *Ray Thomas Gravel*, the Court of Civil Appeals held that under Art. 260–1, the "statutory method of affording protection to an assignee is permissive * * * not exclusive", and that therefore an assignment not in compliance with the statute would not be invalid where the Government had actual notice of the prior assignment. This holding was not challenged by the Government on appeal to the Supreme Court of Texas.
Compare Miami National Bank v. Knudsen, 5 Cir., 1962, 300 F.2d 289, where this Court held, for Florida, that the Florida Accounts Receivable Act, Fla.Stat.Ann. ch. 524, establishes "a mandatory, exclusive system of perfecting assignments of accounts receivable," and that actual notice of the assignment to the account

debtors will not suffice. 300 F.2d at 289, 293–295. Also discussing the Florida statute but providing an analysis and comparison of the Texas statute and its application under Republic National Bank v. Vial, 5 Cir., 1956, 232 F.2d 785, and Keeran v. Salley, Tex.Civ.App., 1951, 244 S.W.2d 663 (writ ref'd), is Ribaudo v. Citizens National Bank, 5 Cir., 1958, 261 F.2d 929 at 936–37.

21. We have not passed upon whether the balance due the Government is subject to administration and prior wage claims under § 67c, 11 U.S.C.A. § 107c of the Bankruptcy Act. See Lawrence v. United States, 5 Cir., 1967, 378 F.2d 452, and accompanying text [No. 22573, May 9, 1967, slip op. pp. 26–27, nn. 39–41].