In re NextWAVE PERSONAL
COMMUNICATIONS, INC.,
et al., Debtors.

NextWave Personal Communications,
Inc., Plaintiff,

v.

Federal Communications Commission,
Defendant.

Bankruptcy No. 98 B 21529(ASH).
Adversary No. 98–5178A.

United States Bankruptcy Court,
S.D. New York.

June 22, 1999.

**306**

Andrews & Kurth L.L.P. by Deborah L. Schrier–Rape, Gregory Bevel, James P. Muenker, Dallas, TX, for plaintiff/debtor.

Mary Jo White, United States Attorney for Southern District of New York by Daniel S. Alter, Jeffrey Oestericher, Wendy H. Schwartz, Edward A. Smith, New York City, for defendant.

Kasowitz, Benson, Torres & Freedman, LLP by David M. Friedman, Robert M. Novick, New York City, for Official Committee of Unsecured Creditors.

### DECISION ON REMEDY

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

On May 12, 1999 this Court issued its decision (the "May 12 Decision") after trial on the merits of the constructive fraudulent conveyance claim asserted by plaintiff-debtor NextWave Personal Communications, Inc. ("NPCI") against defendant Federal Communications Commission ("FCC"). The Court left open the question of remedy and sought further illumination of the parties' positions in light of the ruling on the merits.

To avoid unnecessary repetition, this Decision on Remedy shall be deemed a supplement to and a part of the May 12 Decision. Having ruled on the issue at the May 26 hearing on remedy and signed an order and judgment granting the remedy sought by NPCI, the purpose of this Decision is to set forth the grounds for the ruling.

### Positions of the Parties

#### NPCI

NPCI's position is based upon the words of the statute. Section 544 of the Bankruptcy Code, upon which the claim is based, states that "[t]he trustee may avoid ... any obligation incurred by the debtor that is voidable under applicable law...." NPCI points out that, unlike other provisions of the Bankruptcy Code (*e.g.*, Sections 106(a)(2), (3), 305(a), 1109(b)), which provide that the "court may" or a "party in interest may" do thus and so, the election to avoid a constructively fraudulent transfer is specifically delegated to "the trustee." As debtor-in-possession with all the rights of a trustee under Section 1107, NPCI has requested and states that it is entitled to the avoidance remedy provided by the statute. In addition, NPCI argues that the avoidance remedy is consistent with the objectives of both the Bankruptcy Code and Section 309(j) of the Federal Communications Act. Referring to the overarching bankruptcy policy favoring reorganization, NPCI stresses that avoidance

of the obligation is vital to NPCI's reorganization.

The literal terms of Section 544 (as well as Section 548 and California Civil Code § 3439.07) appear to call for avoidance of the entire obligation where the statutory criteria for avoidance are met. Recognizing that avoidance of the entire obligation would be inappropriate in many cases, particularly where a constructively fraudulent transaction is at issue and the claim is not based upon any element of bad faith on the part of the obligee, NPCI asserts that the FCC should be entitled to a claim in the amount of $1,023,211,000 representing the value conferred as found in the May 12 Decision. NPCI has already paid $474,-364,806, leaving a balance due of $548,846,-194 to be paid in accordance with the installment provisions of the FCC regulations.

As a practical matter this remedy results in avoidance of the $3,720,437,000 portion (the "Fraudulently Incurred Obligation") of NPCI's total bids for its 63 C block licenses which exceeded the combined value of those licenses and the 3 % Payment.

### FCC

In its Supplemental Memorandum of Law Regarding Remedy, the FCC observes that this case arises at the intersection of the Bankruptcy Code and the Federal Communications Act, and that this Court must give effect to both statutes if possible. To this end, the FCC asserts that:

> [T]he Court must honor two essential principles: (1) as between debtor [NextWave] and the FCC, the entire $4.74 billion C block payment obligation remains valid and is only partially avoidable to the extent necessary to benefit NextWave's *bona fide* creditors; and (2) NextWave cannot retain its 63 C block licenses without satisfying its auction bids in full.

FCC Memo on Remedy at 2. To accomplish these objectives, the FCC concludes its Memorandum on Remedy by asserting that the Court should:

> ... (1) order NextWave to surrender its 63 C block licenses to the FCC; (2) allow the FCC to retain all of NextWave's down payments in partial satisfaction of its unavoidable claim, or, in the alternative, to retain $142,309,000 in down payments, direct that the remaining $332,055,806 in down payments be paid to NextWave's estate, and permit the FCC to file an unsecured claim against NextWave's estate for any deficiency in its recovery of $1,023,211,000; and (3) subordinate the FCC's claim for the [Fraudulently Incurred Obligation] to the general unsecured claims.

*Id.* at 13.

Unsure of the meaning and purpose of the FCC's remedial objectives, the Court requested clarification of its position at the May 26 hearing. In explaining its primary objective, the FCC acknowledged or stated among other things:

- Money is not the end goal.... Money is not the objective. (5/26/99 Tr. At 30)
- The objective is "[a] fair and efficient allocation of the limited resource of radio spectrum." (*Id.* at 31)
- "The bid amount, as I said, is what ties the whole process back to the statute and brings it to the heart of the regulatory purpose of congress in adopting a competitive bidding system to allocate the limited resources spectrum. It is the bid amount which drives the industry from the prospective [sic] of allocation spectrum.... And the FCC ... has determined that the bid price is paramount to achieve those ends." (*Id.* at 31–32)

Still uncertain of the FCC's primary objective and theory of remedy, the Court asked whether the FCC would seek rescission (*i.e.,* return to the FCC of the 63 licenses and return to NPCI of the $473 million of deposits) as an alternative if the remedy proposed by the FCC were reject-

ed. The FCC responded that its paramount interest is in getting the licenses back, but stressed to the Court that rescission is "not what we seek" (*id.* at 29).

In short, the FCC wants to recover the 63 licenses, keep the $473 million of deposits or, in the alternative, keep the $142,-309,000 3% Payment and an unsubordinated "deficiency claim" (*i.e.,* $1,023,211,000 less $142,309,000 less whatever the FCC may receive from its resale of the licenses) and, in addition, retain an allowed claim in NPCI's Chapter 11 case for the entire $3.7 billion Fraudulently Incurred Obligation subordinated to existing, but not future, unsecured creditors and, of course, senior to equity both old and new. Not surprisingly, the FCC cites to no case law supporting this astonishing and novel remedy for constructive fraudulent conveyance, and for the reasons discussed below the Court sees no reason to grant it.

### Governing Legal Authorities

■ This Court's fashioning of a remedy is guided by the canon that statutory interpretation begins with the language of the statute itself. *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). *See also United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 240–42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (a statutory provision that is clear on its face should be given full force and effect); *Central Trust Co. v. Official Creditors' of Geiger Enterprises, Inc.,* 454 U.S. 354, 359–60, 102 S.Ct. 695, 70 L.Ed.2d 542 (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)) ("[i]t is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain ... the sole function of the courts is to enforce it according to its terms").

■ Section 544(b) of the Bankruptcy Code provides: "The trustee may avoid ... any obligation incurred by the debtor that is voidable under applicable law...." Section 544(b) incorporates non-bankrupt-

cy law to supplement the trustee's avoiding powers under the Bankruptcy Code. The avoidance powers are intended to promote equitable distribution among creditors by bringing improperly transferred property back into the debtor's estate. *In re Best Products Co., Inc.,* 168 B.R. 35, 57 (Bankr. S.D.N.Y.1994) ("[f]raudulent transfer laws are intended to promote payment to creditors"). Specifically, Section 544(b) allows the trustee or debtor-in-possession in a case under Chapter 11 to invoke the rights of an existing unsecured creditor to set aside a transaction that is voidable under applicable state law.

■ An essential element in the exercise of the avoidance powers in Section 544 *et seq.* of the Bankruptcy Code is that the remedy be "for the benefit of *the estate.*" 11 U.S.C. § 550(a), emphasis supplied. Section 550 thereby places an equitable restraint on the exercise of avoiding powers. The "estate" comprises all interests, including all creditors and equity. Thus, it might be inappropriate to use the avoiding powers if the benefit accrued only to the equity or to only one creditor or one class of creditors. Under the "benefit of the estate" standard, "what matters is whether creditors will receive 'some benefit from the recovery of the [challenged transfers].'" *In re Kennedy Inn Associates,* 221 B.R. 704, 715 (Bankr.S.D.N.Y.1998) quoting from *In re Centennial Industries, Inc.,* 12 B.R. 99, 102 (Bankr.S.D.N.Y.1981). *See also In re Glanz,* 205 B.R. 750, 758 (proper standard is "that recovery by [the debtor] will increase [the debtor's] assets and improve its financial health to the extent that the likelihood is improved of its being able to satisfy its obligations to its creditors under [a] Plan").

■ Recovery of the avoided transfer is appropriate even if the benefit to the estate is indirect. 5 *Collier on Bankruptcy* ¶ 550.02[2], p. 550–7 (15th ed.1998). The term "estate" is broader than the term "creditors," *In re Trans World Airlines, Inc.,* 163 B.R. 964, 972 (Bankr.D.Del.1994),

and benefit has been interpreted broadly to include an indirect benefit such as an increase in the probability of a successful reorganization. *See, In re Tennessee Wheel & Rubber Co. (Tennessee Wheel & Rubber Co. v. Captron Corp. Air Fleet)*, 64 B.R. 721, 725–26 (Bankr.M.D.Tenn.1986), *aff'd*, 75 B.R. 1 (M.D.Tenn.1987); *In re Sweetwater*, 884 F.2d 1323, 1326–7 (10th Cir.1989) (the Tenth Circuit found that if the estate representative appointed pursuant to section 1123(b)(3)(B) realized more cash from the fund's assets than the allowed amount of administrative claims, the remainder would go to the reorganized debtor, which would then be in a better position to meet its financial commitments, if any, under the plan); *In re Acequia, Inc.*, 34 F.3d 800, 811–12 (9th Cir.1994) (allowing recovery of fraudulent transfers even though unsecured creditors have been paid in full when recovery would aid continuing performance of post confirmation obligations and reimburse the bankruptcy estate for fraudulent conveyance litigation costs); *In re Trans World Airlines, Inc.*, 163 B.R. at 973 ("basic purpose of recovery pursuant to § 550(a) is to enlarge the estate for the benefit of creditors ... whether any of it is distributed is a function of the conduct of the case and the negotiations of the plan of reorganization"); *In re Centennial Industries, Inc.*, 12 B.R. at 102 (recovery sufficient so long as unsecured creditors received some benefit from the recovery of the preferences, even if it was not an increase in the amount they would receive).

 Section 544(b)'s avoidance remedy fosters the overall bankruptcy policy favoring reorganization. *In re Chateaugay Corp.*, 201 B.R. 48, 72 (Bankr.S.D.N.Y. 1996), *aff'd in part*, 213 B.R. 633 (S.D.N.Y. 1997) ("[p]ublic policy, as evidenced by chapter 11 of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled companies and concomitant preservation of jobs and going concern values"); *In re Paris Indus., Corp.*, 106 B.R. 339, 341 (Bankr.D.Me.

1989) ("The Bankruptcy Code embodies a governmental policy favoring reorganization and a fresh start"); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) ("policy of Chapter 11 is to permit successful rehabilitation of debtors ... fundamental purpose of reorganization is to prevent a debtor from going into liquidation").

 Contrary to the FCC's position that avoidance be limited to the extent of the claims of existing creditors, it is well settled that once an obligation is deemed voidable the entire transfer is avoided to the extent necessary to benefit the estate, without regard to the size of the claims of the existing creditors whose rights and powers the debtor-in-possession is asserting. *See 5 Collier on Bankruptcy* ¶ 544.09[5], p. 544–21 (15th ed.1998) (discussing *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931)). Under Section 544(b) "if the transfer is avoidable at all by any creditor, it is avoidable in full for all creditors regardless of the dollar amount of the prevailing claim." *In re Acequia, Inc.*, 34 F.3d at 810 (quoting *Abramson v. Boedeker*, 379 F.2d 741, 748 n. 16 (5th Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 563, 19 L.Ed.2d 602 (1967)). *See also, In re Theisen*, 45 B.R. 122, 126–27 (Bankr. D.Minn.1984) ("[O]nce avoidability is determined under state law, the transfer is entirely avoidable by a trustee in bankruptcy regardless of the amount of the creditor's claim relied upon by the trustee," discussing *Moore v. Bay* doctrine).

 In this case, the appropriate remedy is avoidance of the entire obligation and reinstatement of the obligation to the extent of value given. While the literal terms of the applicable statutes (Section 544(b) of the Bankruptcy Code, which incorporates Cal.Civ.Code § 3439.04) and the case law provide for avoidance of the entire obligation, both bodies of law also offer protection to a good faith obligee. Section 548(c) of the Bankruptcy Code provides in pertinent part:

to the extent that a[n] ... obligation ... is voidable under section 544 ... a[n] obligee of such ... obligation that takes for value and in good faith ... may enforce any obligation incurred ... to the extent that such ... obligee gave value to the debtor in exchange for such ... obligation.

11 U.S.C. § 548(c). California's Uniform Fraudulent Transfer Act contains a similar provision.[1] Cal.Civ.Code § 3439.08(d) states:

Notwithstanding voidability of ... an obligation.... a good faith ... obligee is entitled, to the extent of value given the debtor for the ... obligation, to ... enforcement of any obligation incurred.

Thus, when an obligation is avoided under Section 544(b) of the Bankruptcy Code, both statutes entitle the obligee to enforce the obligation to the extent of value given the debtor. Recognizing yet another canon of statutory construction, namely "that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it," the proper remedy lies in Section 548(c) of the Bankruptcy Code. *See In re Granite Partners, L.P.*, 208 B.R. 332, 341 (Bankr. S.D.N.Y.1997) (discussing restriction of remedial provisions of securities laws as interpretive analogies to Bankruptcy Code Section 510(b), citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 574, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) and quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979)); *see also Patterson v. Shumate*, 504 U.S. 753, 759, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) (statute must be enforced according to its terms) and *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (plain meaning of statute governs unless demonstrably at odds with drafters' intent). Accordingly, the FCC has a valid claim that is enforceable to the

extent of value given the debtor, less the sum already paid by the debtor.

The case law is consistent with the remedy expressed on the face of Section 548(c). *See, In re Telesphere Communications, Inc.*, 179 B.R. 544, 559 (Bankr. N.D.Ill.1994) (lenders entitled to enforce their obligation to the extent of value given [the debtor]); *In re Wes Dor, Inc.*, 996 F.2d 237, 243 (10th Cir.1993) (finding transferee liable for amount of transfer minus value extended to the debtor); *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 662 (7th Cir.1992) (avoiding subsidiary's guarantee of parent's debt in excess of value given to the subsidiary).

### Conclusions on Remedy

While NPCI urges the Court to apply Section 544 as written, the FCC urges the Court to use "remedial flexibility." Since Section 544(b) is clear on its face and under the case law, the Court will apply the statute as written, mindful of the Supreme Court admonition that statutes should be enforced as written. *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. at 240–42, 109 S.Ct. 1026 and *Patterson v. Shumate*, 504 U.S. at 759, 112 S.Ct. 2242.

The statutory remedy is avoidance of the entire obligation upon a finding of fraudulent conveyance. *See In re Acequia, Inc.*, 34 F.3d at 809–10 ("[a] transaction that is voidable ... may be avoided in its entirety"). However, the FCC may enforce NPCI's obligation to the extent it provided value to the debtor's estate. Stated differently, only the Fraudulently Incurred Obligation will be avoided.

The purported "remedy" urged upon the Court by the FCC in this fraudulent conveyance proceeding exhibits "remedial flexibility" to such an extent that it barely merits discussion. In the face of a statute of Congress intended to rectify inequities among creditors and facilitate reorganization of debtors, and despite this Court's

---

**1.** The legislative committee comment to Cal. Civ.Code § 3439.08(d) acknowledges that the statute was adapted from Section 548(c) of the Bankruptcy Code.

finding of fact after trial that NPCI's indebtedness to the FCC was roughly five times the value of the C block licenses when conveyed, the FCC has proposed as a "remedy" that it should reclaim the licenses and, at the same time, retain all or a substantial portion of the $473 million paid by NPCI for the licenses and retain a claim in NPCI's bankruptcy for the $3.7 billion Fraudulently Incurred Obligation subordinated only to existing unsecured debt. Such a decree would reduce the value conveyed by the FCC to NPCI from $1.023 billion to zero ($0.00) while allowing the FCC to retain up to $473 million of the debtor's money and a subordinated claim for $3.7 billion. It would render NPCI hopelessly insolvent and result in prompt conversion to Chapter 7 and liquidation of this debtor.

The utter irrationality of the FCC's proposed remedy is manifest from the fact that, if the FCC reclaims the licenses, every dollar of cash and every dollar of allowed claim retained by the FCC would itself automatically become a fraudulent conveyance, since the licenses constituted the FCC's only contribution to NPCI in exchange for its cash and debt obligation. In other words, the FCC asks the Court not to rectify but to compound the constructive fraudulent conveyance already adjudicated by ordering the debtor to return the entire value received from the FCC while allowing the FCC to retain much of what the debtor paid for that value.

The remedy proposed by NPCI and adopted by this Court is intuitively fair and equitable to both the government and the debtor's estate and implements both the letter and the spirit of the Federal and state statutes and the case law governing debtor-creditor relations. The FCC will retain an obligation for the full value of the consideration which it conveyed to the debtor. The avoidance remedy fully comports with the "benefit of the estate" standard of Section 550(a) in that the debtor's estate will be relieved of that portion of its financial obligation to the FCC for which it received no value and will be able to proceed promptly with a viable plan of reorganization, having access to the public financial markets which was precluded by reason of the $3.7 billion Fraudulently Incurred Obligation not backed by any asset value.

Although eschewed by the FCC, a more rational alternative to the avoidance remedy proposed by the debtor would be traditional rescission, which would achieve the FCC's purported primary objective of cancellation and return of the 63 C block licenses for reauction while returning the cash deposits to NPCI and cancelling all debt to the FCC. But avoidance, not rescission, is the remedy mandated by the Bankruptcy Code. Moreover, the "benefit of the estate" test and the overarching policy of the bankruptcy laws favoring reorganization both weigh heavily in favor of the avoidance remedy, since the likelihood of a successful reorganization of NPCI appears to be high with the 63 C block licenses, and virtually nil without them.

The avoidance remedy is also far more consonant with the statutory objectives expressed in Section 309(j) of the Federal Communications Act than rescission. Under Section 309(j) the FCC was charged with achieving four clearly expressed objectives: (1) the development and rapid deployment of new wireless technology for the benefit of the public without administrative or judicial delays; (2) promotion of economic opportunity and competition by disseminating licenses among a wide variety of applicants including entrepreneurial, small businesses; (3) recovery for the public of a portion of the value of radio spectrum; and (4) the efficient and intensive use of spectrum. 47 U.S.C. § 309(j)(3). Each of these statutory policy objectives is advanced by the avoidance remedy and inhibited by rescission.

First, rescission and cancellation of NPCI's 63 C block licenses would result in lengthy and indeterminate delay in the deployment and use of those licenses.

Even if there were no appeal from this Decision by either party, there can be no assurance when or whether the FCC would reauction the licenses, and it is unlikely that any reauction would be commenced in less than eight or nine months, judging from the 1999 reauction. Any reauction could be expected to take three to four months, as in the case of past auctions, and the license approval process for the successful bidder(s) could be expected to take up to five months particularly in the event of a third-party challenge, as in the case of NextWave. Thus, a delay of twelve to eighteen months or possibly substantially more would be the likely result of rescission, which is significant in the highly competitive and rapidly moving wireless telecommunications industry.

Second, NPCI and its NextWave affiliates are not only qualified under Section 309(j) as entrepreneurial designated entities to hold C and F block licenses, but as the largest holder of PCS spectrum in the C/D/E/F blocks NextWave undoubtedly would constitute the only potential candidate to compete with the major players such as AT & T, Sprint and NextTel which the FCC's trial expert, Dr. Salant, viewed as a prime objective of the C block auction. If NPCI's 63 C block licenses were cancelled and reauctioned, there can be no assurance that NextWave or any single bidder would succeed in winning all or most of the 63 licenses, or that the FCC would award the licenses to NextWave if it were the successful bidder. Moreover, NextWave's "carrier's carrier" business strategy could provide potential access to PCS spectrum for a variety of resellers of wireless services and thereby "promot[e] . . . economic opportunity and competition by disseminating licenses among a wide variety of applicants including small businesses." 47 U.S.C. § 309(j)(3).

Third, although Section 309(j) charges the FCC only "to recover a portion of the value of the licenses for the public" (emphasis supplied), the avoidance remedy will recover for the public fisc $1.023 billion, which exceeds the full value of the 63 C block licenses ($908 million) as of February 1997. It would appear that this far exceeds the present fair market value of the 63 C block licenses, judging by the values achieved in the 1999 reauction of predominantly C block licenses.

Finally, the avoidance remedy will promote, the prompt, efficient and intensive use of PCS spectrum. Less than ten percent of the original C block licenses are currently in use. NPCI represents that it has conducted extensive site planning and/or radio frequency design in many of the markets covered by its C block licenses and has successfully installed PCS network equipment in trial systems in San Diego, San Antonio, Washington, D.C. and Las Vegas. As purportedly the only wireless provider dedicated to the wholesale "carrier's carrier" strategy, NPCI asserts that it will create competitive opportunities that do not exist in the wireless marketplace today, and may not exist in the event of rescission and reauction.

As to the FCC's subordination and "benefit to creditors" argument, *In re Best Products, Inc.,* 168 B.R. 35, 57 (Bankr. S.D.N.Y.), *aff'd,* 68 F.3d 26 (2d Cir.1995) and *In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 288 (Bankr.S.D.N.Y.1990), cited in support of the FCC's contention that the $3.7 billion Fraudulently Incurred Obligation should be merely subordinated to existing unsecured creditors, rather than avoided, are conceptually inapposite. Both cases involved proceedings seeking to confirm reorganization plans and, in that context, approval of settlements of putative but unasserted fraudulent transfer claims against lenders arising out of leveraged buy-out ("LBO") transactions involving the debtor. Regarding remedy, one court recognized that "[o]ne of the murkiest areas of fraudulent transfer law as applied to LBOs is what remedy to apply when the plaintiff prevails." *Best Products,* 168 B.R. at 57. In both *Best Products* and *Crowthers McCall* the lenders in question

made loans to the respective debtors and took back promissory notes in precisely the amount of the consideration furnished by the lenders to the debtors, i.e., the loans. The fraudulent transfer theory which might have been asserted against these lenders, and which was compromised in the context of the reorganization plans, was that the loans in question were merely steps in a series of transactions in connection with the LBOs by which the new shareholders, in effect, appropriated the loan proceeds to acquire the debtors' equity for their own personal benefit, thereby depriving the debtors and the debtors' other creditors of the economic benefits of the loans. The inherently "inside" nature of these LBO transactions generates a split of interest within the "estate" between the acquiring equity interest and their lender-funders versus the debtor's existing or "old" creditors. In such a context, it is not surprising that both courts would have employed language to the effect that the fraudulent transfer remedy, if any, should benefit the debtors' creditors, but that the indebtedness should be enforced vis-a-vis the debtors' equity shareholders who derived benefit to the extent of the money actually advanced by the lenders. In such a circumstance, the appropriate remedy might well be subordination, which would benefit the creditors harmed by the improper LBO diversion of the debtors' assets while leaving the lenders with a claim superior to the shareholders for the fair value of the loans which they extended to the debtors.[2]

The constructive fraudulent conveyance claim involved in this adversary proceeding bears no resemblance to the putative fraudulent transfer claims which were the subject of *Best Products* and *Crowthers McCall*. The debts owing to the lenders in those cases which might have been subordinated, rather than avoided altogether, in the LBO context were supported dollar-for-dollar by loans actually advanced to and received by the debtors. To avoid those debt obligations would deprive the lenders of consideration actually given and resulted in a windfall for the shareholders who allegedly were the real beneficiaries of the loan proceeds. By contrast, neither NPCI nor its shareholders or creditors received any consideration from the FCC in respect of the $3.7 billion Fraudulently Incurred Obligation, and to enforce that Obligation even as subordinated debt would constitute a windfall for the FCC. Moreover, the settlements of the putative fraudulent transfer claims against the lenders in *Best Products* and *Crowthers McCall* were approved in the context of seeking to approve those debtors' reorganization plans. By contrast, in this case to allow $3.7 billion as a subordinated claim would preclude NPCI's access to public funding and thereby undermine any practical likelihood of NPCI's success as a reorganized debtor.

Finally, Judge (now Chief Judge) Brozman's decision in *Best Products* expressly recognizes the appropriateness of the remedy fashioned in this decision in a case such as this involving avoidance of an obligation for which the debtor received no consideration. Judge Brozman noted:

> On the other hand, if the underlying fraudulent transfer statute (such as DCL § 273) provides for the avoidance as fraudulent of an obligation incurred, it could be argued fairly persuasively that so much of the obligation which the debtor incurred as was not supported by consideration *to the debtor*, ought be avoidable. (emphasis in original)

*Best Products* at 59, citing *In re Candor Diamond Corp.*, 76 B.R. 342 (Bankr. S.D.N.Y.1987).

---

**2.** It should be emphasized that the language relied upon by the FCC in the *Best Products* and *Crowthers McCall* decisions did not constitute holdings by the respective bankruptcy courts determining remedies in litigated fraudulent conveyance claims. The courts in both cases were merely discussing the hurdles which the debtors might face in the context of approving settlements of possible fraudulent transfer claims which were not, in fact, litigated.

314

Nor can the FCC take comfort from the citation and quotation of *In re Vintero Corp.*, 735 F.2d 740, 742 (2d Cir.) ("To the extent that [a debtor's] other creditors ... are not affected adversely by enforcement of [an avoidable] security interest, there is no reason why such interest should not be enforced"), *cert., denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984). There can be no question that the debtor and its shareholders and its creditors would be affected adversely by any enforcement of the $3.7 billion Fraudulently Incurred Obligation in exchange for which the FCC provided no consideration to the debtor.

Finally, the FCC's arguments based upon *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), *In re D.H. Overmyer Telecasting Co.,* 35 B.R. 400 (Bankr. N.D.Ohio 1983) and *In re Nitec Paper Corp.,* 43 B.R. 492 (S.D.N.Y.1984) to the effect that bankruptcy proceedings cannot be used to override the regulatory authority of administrative agencies have been fully dealt with in this Court's December 7, 1998 decision on the FCC's motion to dismiss for lack of subject matter jurisdiction and June 16, 1999 decision denying the FCC's motion to lift the automatic stay. Reference is made to those decisions. Suffice it here to say that the issues before this Court in this adversary proceeding concern solely the debtor-creditor relationship between the FCC and NPCI. Nothing in the Federal Communications Act or elsewhere in the law exempts the FCC from the operation of the Bankruptcy Code *in its capacity as a creditor.* Nothing in this Court's May 12 Decision or in this Decision on Remedy implicates the FCC's regulatory jurisdiction.

NPCI is entitled to judgment in accordance with this Decision.