Opinion for the Court filed by Circuit Judge TATEL.
TATEL, Circuit Judge:
This case concerns the extent to which the Bankruptcy Code limits a federal agency — here, the Federal Communications Commission — acting to implement the provisions of its own statute. Seeking to comply with its statutory duty to ensure small business participation in auctions of broadband PCS licenses, the Commission allowed winning bidders to pay for their licenses in installments. As part of this scheme, the Commission took and perfected security interests in the licenses, and provided for license cancellation should a bidder fail to make timely payments. When appellants, winning bidders on several licenses, declared bankruptcy and ceased making payments, the Commission canceled their licenses. Applying the fundamental principle that federal agencies must obey all federal laws, not just those they administer, we conclude that the Commission violated the provision of the Bankruptcy Code that prohibits governmental entities from revoking debtors’ licenses solely for failure to pay debts dischargeable in bankruptcy. The Commission, having chosen to create standard debt obligations as part of its licensing scheme, is bound by the usual rules governing the treatment of such obligations in bankruptcy.
I
In 1993, Congress amended the Communications Act of 1934 to authorize the Federal Communications Commission to award spectrum licenses “through a system of competitive bidding.” 47 U.S.C. § 309(j)(l). In “identifying classes of licenses and permits to be issued by competitive bidding,” and in “designing the methodologies” for such bidding, Congress directed the Commission to promote several objectives, including “the development and rapid deployment of new technologies, products and services,” the “recovery for the public of a portion of the value of the public spectrum resource made available for commercial use,” and the “efficient and intensive use of the electromagnetic spectrum.” Id. § 309(j)(3). Congress also directed the Commission to “promot[e] economic opportunity and competition and ensur[e] that new and innovative technologies are readily accessible to the American people by ... disseminating licenses among a wide variety of applicants, including small businesses [and] rural telephone companies.” Id. § 309(j)(3)(B). To further this last goal, Congress directed the Commission to “consider alternative payment schedules and methods of calculation, including lump sums or guaranteed installment payments ... or other schedules or methods.” Id. § 309(j)(4)(A).
Acting pursuant to this statute, the Commission adopted rules to auction licenses for “broadband PCS” — “personal communications services in the 2 GHz band.” In re Implementation of Section S09(j) of the Communications Act, 9 FCC Red 5532 ¶ 1 (1994). The Commission expected broadband PCS to “provide new mobile communications capabilities” through “a new generation of communications devices”, including “small, lightweight, multi-function portable phones, portable facsimile and other imaging devices, new types of multi-channel cordless phones, and advanced paging devices with two-way data capabilities.” Id. ¶ 3. The Commission “determined that the use of competitive bidding to award broadband PCS licenses, as compared with other licensing methods, would speed the development and deployment of new services to *134 the public and would encourage efficient use of the spectrum,” as required by statute, since “auctions would generally award licenses quickly to those parties who value them most highly and who are therefore most likely to introduce service rapidly to the public.” Id. ¶ 5. The Commission expected the PCS license auction to “constitute the largest auction of public assets in American history,” recovering “billions of dollars for the United States Treasury,” and thus fulfilling another statutory mandate. Id. ¶ 1.
As directed by Congress, the Commission adopted a variety of measures to promote small business ownership of PCS licenses, including setting aside two blocks of licenses, the “C” and “F” Blocks, for bidding by entities with annual gross revenues and total assets below specified amounts. Id. ¶ 12. Especially relevant to this case, the Commission allowed “most successful bidders within the [C and F Blocks] to pay for their licenses in installments.” Id. ¶ 16. Observing that “the primary impediment to participation [in license auctions] by designated [small business] entities is lack of access to capital,” id. ¶ 10, the Commission concluded that “installment payments are an effective means to address the inability of small businesses to obtain financing and will enable these entities to compete more effectively for the auctioned spectrum.” Id. ¶ 135. “By allowing payment in installments,” the Commission stated, “the government is in effect extending credit to licensees, thus reducing the amount of private financing needed prior to and after the auction.” Id. ¶ 136. The Commission also announced that “[t]imely payment of all installments will be a condition of the license[] grant and failure to make such timely payment will be grounds for revocation of the license.” Id. ¶ 138.
In 1995, a group of former telecommunications executives founded NextWave Personal Communications Inc. and NextWave Power Partners Inc. (collectively “Nex-tWave”), appellants in this case, for the purpose of bidding on PCS licenses and operating a personal communications service. NextWave’s founders hoped the company would become a “carrier’s carrier,” selling wireless services and airtime wholesale. Appellants’ Opening Br. at 5. At C Block auctions in May and July, 1996, NextWave bid $4.74 billion in total, winning sixty-three licenses. The company made a $474 million down payment. Several months later, the Commission granted NextWave its licenses, took a security interest in each, and filed UCC financing statements to perfect its claims. The security agreements gave the Commission “a first lien on and continuing security interest in all of the Debtor’s rights and interest in [each] License.” Security Agreement between NextWave and FCC ¶ 1 (January 3, 1997). The licenses included the following language: “This authorization is conditioned upon the full and timely payment of all monies due pursuant to ... the terms of the Commission’s installment plan as set forth in the Note and Security Agreement executed by the licensee. Failure to comply with this condition will result in the automatic cancellation of this authorization.” FCC, Radio Station Authorization for Broadband PCS 2 (issued to NextWave January 3, 1997).
After the Commission awarded the C Block licenses, several successful bidders, including NextWave, experienced difficulty obtaining financing, having agreed to pay on average almost three times what winning bidders in the prior A and B Block auctions had paid, and several times what winning bidders in subsequent D, E, and F block auctions paid. In response, the Commission suspended installment payment obligations for C Block licensees, and *135 then issued two Restructuring Orders, offering a variety of revised financing options that allowed C Block licensees to surrender some or all of their licenses for full or partial forgiveness of their outstanding debt. See In re Amendment of the Comm’n’s Rules Regarding Installment Payment Fin. for Pers. Communications Sens. Licensees, Second Report and Order and Further Notice of Proposed Rule Making, 12 FCC Red 16436 ¶ ¶ 6, 32-69 (1997); In re Amendment of the Comm’n’s Rules Regarding Installment Payment Fin. for Pers. Communications Sens. Licensees, Order on Recons, of the Second RepoR and Order, 13 FCC Red 8345 ¶ ¶ 11-15 (1998); see also In re Amendment of the Comm’n’s Rules Regarding Installment Payment Fin. for Pers. Communications Sens. Licensees, Second Order on Recons, of the Second RepoR and Order, 14 FCC Red 6571 (1999). None of the restructuring options allowed licensees to keep any of their licenses for less than the full bid price. See In re Amendment of the Comm’n’s Rules, Order on Recons., 13 FCC Red 8345 ¶ 8. According to the Commission, these options balanced the goals of introducing new spectrum services rapidly and promoting small business participation in PCS auctions against the need to maintain auction integrity and treat unsuccessful bidders fairly. See In re Amendment of the Comm’n’s Rules, 12 FCC Red 16436 ¶ ¶ 1-5; see also U.S. Airwaves, Inc. v. FCC, 232 F.3d 227 (D.C.Cir.2000) (upholding restructuring scheme). The Commission gave licensees until June 8, 1998 to elect a restructuring option, and until July 31, 1998 to resume installment payments. Public Notice, Wireless Telecommunications Bureau Announces June 8, 1998 Election Date, 13 FCC Red 7413 (1998). It set October 29, 1998 as the last date it would accept late installment payments. Id.
On June 8, 1998, after failing to obtain stays of the election deadline from the Commission and this court, NextWave filed for Chapter 11 bankruptcy protection in New York. See NextWave Pers. Communications, Inc. v. FCC (In re NextWave Pers. Communications, Inc), 235 B.R. 263, 267 (Bankr.S.D.N.Y.1998) (“NextWave I"). Because the Bankruptcy Code is central to this case, we pause to summarize certain relevant provisions. Section 362, the “automatic stay” provision, provides that petitions filed under Chapter 11 “operate[ ] as a stay, applicable to all entities” of a variety of acts to collect on or enforce debts. 11 U.S.C. § 362(a). Subsection 362(a)(3) stays “any act to obtain possession of property of [an] estate ... or to exercise control over property of the estate,” id. § 362(a)(3), but subsection 362(b)(4) provides an exception to 362(a)(3) for “governmental unit[s]” acting to “enforce” their “regulatory power.” Id. § 362(b)(4). Subsections 362(a)(4) and (5) stay “any act to create, perfect, or enforce any lien against property of the estate” or of the debtor. Id. § 362(a)(4), (5). The regulatory power exception does not apply to these subsections. See id. § 362(b)(4). In general, an automatic stay lasts only until a bankruptcy case is closed or dismissed, or until the bankruptcy court grants or denies a discharge. See id. § 362(e)(2). Other provisions of the Code, however, offer more permanent relief. Section 525 prohibits “governmental unit[s]” from “revoking]” a bankrupt’s or debtor’s license “solely because such bankrupt or debtor ... has not paid a debt that is dischargeable ... under this title.” Id. § 525(a). Finally, under section 1123, 11 U.S.C. § 1123, bankrupts (subject to court approval) have the power to “cure” their defaults — that is, to “tak[e] care of the triggering event and return[] to pre-de-fault conditions.” Di Pierro v. Taddeo (In *136 re Taddeo), 685 F.2d 24, 26-27 (2d Cir.1982).
After declaring bankruptcy, and in line with the “normal deferment of the payment of preorganization claims until their disposition can be made part of a plan of reorganization,” In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n. 1 (3d Cir.1972), NextWave made no further payments on its licenses. Nor did it seek permission to make installment payments under the “necessity of payment” doctrine, which some courts have invoked to authorize payment of prepetition claims “if such payment [is] essential to the continued operation of the debtor.” In re Just For Feet, Inc., 242 B.R. 821, 825 (Bankr.D.Del.1999). NextWave sought no such authorization, it explains, because “the Code’s automatic stay provision generally prevents even government creditors from enforcing payment obligations or seizing assets of the estate,” and thus it had “no reason to believe it would be required to make the October 1998 installment payment while in bankruptcy.” Appellants’ Opening Br. at 10 & n.8.
Instead, NextWave alleged in the bankruptcy court that its $4.74 billion license fee obligation was avoidable under section 544 of the Bankruptcy Code as a “fraudulent conveyance” since the company had not received reasonably equivalent value in exchange for incurring the obligation: by the time the Commission actually conveyed the licenses to NextWave, the company claimed, their value had declined to less than $1 billion. NextWave I, 235 B.R. at 269; see also NextWave Pers. Communications, Inc. v. FCC (In re NextWave Pers. Communications), 235 B.R. 277, 290 (Bankr.S.D.N.Y.1999) (“NextWave III”). Ruling on this claim, the bankruptcy court began by addressing its jurisdiction. It acknowledged that under 47 U.S.C. § 402, it lacked jurisdiction to “enjoin[], review[ ], assess[ ] damages for or otherwise adjudicate] the consequences of the conduct of [a] Federal agency acting within the scope of its Congressional mandate.” NextWave I, 235 B.R. at 268. It nevertheless asserted jurisdiction over the case because, in its view, NextWave’s claim against the Commission did not involve “any regulatory conduct on the part of the FCC,” but rather concerned solely the debtor-creditor relationship between the FCC and NextWave. Id. at 269; see also NextWave Pers. Communications, Inc. v. FCC (In re NextWave Pers. Communications), 235 B.R. 305, 314 (Bankr.S.D.N.Y. 1999) (“NextWave IV”). Nothing in the Communications Act, the court said, suggests that a bankruptcy court lacks jurisdiction to implement the provisions of the Code “which affect [the Commission] as a creditor.” NextWave I, 235 B.R. at 269-70. Turning to the merits, the court found that NextWave’s winning bid exceeded the fair market value of its licenses at the time they were conveyed, NextWave III, 235 B.R. at 304, and avoided $3.72 billion of NextWave’s $4.74 billion license fee obligation, ruling in effect that the company could keep its licenses for the reduced price of $1.02 billion. See NextWave IV, 235 B.R. 305, qffd, NextWave Pers. Communications, Inc. v. FCC (In re NextWave Pers. Communications, Inc.), 241 B.R. 311, 321 (S.D.N.Y.1999); see also In re NextWave Pers. Communications, Inc., 235 B.R. 314, 316 (Bankr.S.D.N.Y.1999) (“NextWave V”).
The Second Circuit reversed, making four key points. First, it emphasized that the Commission’s action, contrary to the bankruptcy court’s finding, was regulatory: the Commission explicitly “made Tull and timely payment of the winning bid’ a regulatory condition for obtaining and retaining a spectrum license,” and this condition had a purpose “related directly to the FCC’s implementation of the spectrum *137 auctions.” FCC v. NextWave Pers. Communications, Inc. (In re NextWave Personal Communications), 200 F.3d 43, 52 (2d Cir.1999) (quoting 47 C.F.R. § 24.708). The Second Circuit explained the Commission’s regulatory purpose as follows:
[The FCC] decided that it would be “critically important to the success of our system of competitive bidding ... [to] provide strong incentives for potential bidders to make certain of their qualifications and financial capabilities before the auction so as to avoid delays in the deployment of new services to the public that would result from litigation, disqualification and re-auction.” ... [Since] “designated entities” such as NextWave ... were allowed to pay in installments^] [i]t was important for the functioning of the auction ... that the FCC’s default rules and penalties be enforceable, because the FCC relied upon them as a substitute for conducting the “detailed credit checks” and other forms of due diligence that otherwise would be necessary to ensure ... that the licenses would be awarded to the appropriate entities.
Id. at 52-53 (quoting In re Implementation of Section 309(j) of the Communications Act — Competitive Bidding, Second Report and Order, 9 FCC Red 2348 ¶ ¶ 197,194,198 (1994)).
Second, the court held that the bankruptcy court had interfered with this regulatory purpose by avoiding a substantial portion of NextWave’s bid price, thus allowing the company to keep the licenses for a reduced price. Id. at 55. This, the Second Circuit held, the bankruptcy court had no jurisdiction to do: “Because jurisdiction over claims brought against the FCC in its regulatory capacity lies exclusively in the federal courts of appeals, see ... 47 U.S.C. § 402, the bankruptcy and district courts lacked jurisdiction to decide the question of whether NextWave had satisfied the regulatory conditions placed by the FCC upon its retention of the Licenses.” In re NextWave, 200 F.3d at 54.
Third, the Second Circuit found that besides interfering with the Commission’s licensing function through a collateral proceeding, the bankruptcy court had in effect attempted to exercise that function itself— again exceeding its jurisdiction:
By holding that for a price of $1,023 billion NextWave would retain licenses for which it had bid $4.74 billion, the bankruptcy ... court[ ] impaired the FCC’s method for selecting licensees by effectively awarding the Licenses to an entity that the FCC determined was not entitled to them. In so doing [it] exercised the FCC’s radio-licensing function .... [E]ven if the bankruptcy ... court[] [was] right in concluding that granting the Licenses at a small fraction of NextWave’s original successful bid price best effectuated the [Federal Communication Act’s] goals, [it was] utterly without the power to order that Nex-tWave be allowed to retain them for that reason or on that basis.
Id. at 55 (internal citations omitted).
Finally, notwithstanding its conclusion that the bankruptcy court lacked jurisdiction to change the conditions under which NextWave could retain its licenses, the Second Circuit acknowledged that the bankruptcy court might well have jurisdiction over NextWave’s underlying debts themselves: “To the extent that the financial transactions between [the FCC and NextWave] do not touch upon the FCC’s regulatory authority, they are indeed like the obligations between ordinary debtors and creditors.” Id. Pointing out that NextWave “remain[ed] a debtor in bankruptcy,” and that “[i]f the Licenses [were] returned to the FCC, the bankruptcy court [might] resolve resulting financial claims *138 that the FCC has against NextWave,” id. at 56, the Second Circuit reviewed the merits of the bankruptcy court’s avoidance decision and concluded that NextWave should not be allowed to avoid $3.72 billion of its debt under the Bankruptcy Code. Id. at 46, 62.
Immediately following the Second Circuit reversal, NextWave prepared a new plan of reorganization that provided for a single lump sum payment to satisfy its entire $4.3 billion outstanding obligation to the Commission, including interest and late fees. The Commission objected to the plan, alleging that NextWave’s licenses had automatically canceled when the company missed its first payment deadline in October 1998. See In re Pub. Notice DA 00-4-9, Auction of C and F Block Broadband PCS Licenses, Order on Reconsideration, FCC 00-335 ¶ 7 (Sept. 6, 2000). Simultaneously, the Commission issued a public notice announcing re-auction of NextWave’s licenses. The notice stated that the licenses were “available for auction under the automatic cancellation provisions” of the Commission’s regulations. Public Notice, Auction of C and F Block Broadband PCS Licenses, DA 00-49, 15 FCC Red 693 (2000).
The dispute then returned to the bankruptcy court, which declared the Commission’s cancellation of NextWave’s licenses “null and void” as a violation of various provisions of the Bankruptcy Code, including the automatic stay provisions of section 362(a). In re NextWave Pers. Communications, Inc., 244 B.R. 253, 257-58, 267-68 (Bankr.S.D.N.Y.2000)(“NextWave VI”). In reaching this conclusion, the bankruptcy court acknowledged that under the Second Circuit’s ruling, it lacked jurisdiction to interfere with the Commission’s regulatory acts. Id. at 260-61. It also acknowledged that it was bound by the Second Circuit’s decision that “a regulatory purpose was implicit in the ‘full payment requirement’ in the FCC regulations.” Id. at 270. As the bankruptcy court saw it, however, the “regulatory objective” behind the full payment requirement had been “fulfilled in the debtors’ modified Plan .... to pay the entire $4.3 billion outstanding ... in a lump sum upon confirmation.” Id. The cancellation of NextWave’s licenses, in contrast, was a response to the company’s failure to make a timely payment, and this requirement, the court reasoned, was “purely economic,” having to do with “the time value of money.” Id. “[T]he economic consequence of delay,” it stated, “will be fully cured by payment in full of all applicable interest, penalties and late fees.... ” Id. Further explaining its view that the timely payment requirement lacked a regulatory purpose, the bankruptcy court discussed at length its reasons for believing that canceling licenses for failure to make a timely payment “conflict[ed] with the spirit and the letter of the agency’s governing statute” — namely, section 309(j) of the Communications Act. Id. at 281; see also id. at 282-83, 271. Concluding that the Commission “has not and cannot articulate any regulatory interest entailed in the ‘timely payment’ requirement,” id. at 270, the court ruled that the Second Circuit’s prior decision did not preclude it from declaring the cancellation void. Id. at 283.
Again, the Second Circuit reversed. In re FCC, 217 F.3d 125 (2d Cir.2000). Granting a mandamus petition filed by the Commission, the court held that “[tjhere can be little doubt that if full payment is a regulatory condition, so too is timeliness.” Id. at 136. In the court’s view, “the regulatory purpose for requiring payment in full — the identification of the candidates having the best prospects for prompt and efficient exploitation of the spectrum — is quite obviously served in the same way by requiring payment on time.” Id. at 135. *139 The conclusion that the Commission’s decision “was in fact regulatory,” the court went on, was “reinforced” by the fact that the bankruptcy court, in deciding that the license cancellation lacked a regulatory purpose, had explained at length that the cancellation and re-auction were contrary to the purposes of section 309(j) of the Communications Act. Id. at 136. But according to the Second Circuit, these discussions, rather than explaining why the re-auction decision was not regulatory, explained why, under the Communications Act, it was arbitrary, and such a determination, the Second Circuit pointed out, was “outside the jurisdiction of the bankruptcy court.” Id. “[A] regulatory condition is a regulatory condition even if it is arbitrary. It is for the FCC to state its conditions of licensure, and for a court with power to review the FCC’s decisions to say if they are arbitrary or valid.” Id. at 137.
As a consequence, the Second Circuit concluded that the bankruptcy court had both violated the appellate court’s earlier mandate and exceeded the bankruptcy court’s own jurisdiction. Id. “The bankruptcy court,” the Second Circuit stated, “construes our mandate to mean no more than that the bankruptcy court may not abrogate the full-payment requirement on the basis of a fraudulent conveyance holding.” Id. at 139. But this understanding “under-reads our previous opinion.” Id. That opinion “clearly instructed] the bankruptcy court to refrain from interfering with the licensing decisions of the FCC,” id., and as the Second Circuit saw it, this is exactly what the bankruptcy court did in declaring the license cancellation null and void. In addition, because “[exclusive jurisdiction to review the FCC’s regulatory action lies in the courts of appeals” under 47 U.S.C. § 402, In re FCC, 217 F.3d at 139, the Second Circuit found that the bankruptcy court’s license cancellation holding exceeded that court’s jurisdiction. Id. at 141. The court also noted that “NextWave remains free to pursue its challenge to the FCC’s regulatory acts” in another forum, pointing out that the company had already filed “protective notices of appeal” in this court. Id. at 140-41.
After losing in the Second Circuit, Nex-tWave filed a petition with the Commission, requesting reconsideration of the license cancellation. Denying the petition, the Commission noted first that the public notice of reauction “was not an order or action of the Commission ... canceling NextWave’s licenses.” Order on Reconsideration, FCC 00-335 ¶ 10. Rather, “[pursuant to [Commission] rules, the licenses canceled automatically” after Nex-tWave failed to make its first installment payment. Id. The Commission thus concluded that NextWave’s petition was “late” and its challenge to the reauction notice “procedurally defective.” Id. “Nevertheless, because of the importance of the issues raised in NextWave’s petition,” id., the Commission went on to address the company’s challenge to the automatic cancellation. The Commission rejected Nex-tWave’s arguments that the cancellation was arbitrary and capricious and barred by estoppel and waiver, id. ¶ ¶ 11-33, and found that the company’s Bankruptcy Code arguments, having been “summarily rejected by the Second Circuit,” were “precluded under the doctrine of res judi-cata.” Id. ¶ 26.
NextWave now challenges the Commission’s decision on two basic grounds. First, it claims that the license cancellation is “patently unlawful,” Appellants’ Opening Br. at 16, under the provisions of the Bankruptcy Code described earlier: the anti-discrimination provision (section 525), the automatic stay provision (section 362), and the provision of the Code allowing debtors to “cure” their defaults (section *140 1123). Second, citing our decision in Trinity Broadcasting of Florida, Inc. v. FCC, 211 F.3d 618, 631 (D.C.Cir.2000), where we held that an agency may not “sanction a company for its failure to comply with regulatory requirements” without first providing “fair notice” of those requirements, NextWave argues that even if the license cancellation is not barred by the Bankruptcy Code, it is invalid because the Commission failed to provide adequate notice that the timely payment regulations apply to Chapter 11 debtors. The Commission, supported by Intervenors (the Cellular Telecommunications Industry Association and several telecommunications companies), defends its decision.
II
We begin with three threshold issues. Does our jurisdiction in this case arise from 47 U.S.C. § 402(a) or 402(b)? Was NextWave’s challenge to its license cancellation timely? And are NextWave’s Bankruptcy Code arguments barred by res judi-cata? We consider each question in turn.

Jurisdiction

NextWave has filed both a petition for review under section 402(a) and a notice of appeal under section 402(b) of the Communications Act. Section 402(a) provides that “[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought” in a court of appeals. See 47 U.S.C. § 402(a) (cross-referencing 28 U.S.C. § 2342(1)). Section 402(b), in contrast, provides:
Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia ... [b]y the holder of any construction permit or station license which has been modified or revoked by the Commission.
Id. § 402(b). Acknowledging that we have previously found these two provisions mutually exclusive, see Friedman v. FCC, 263 F.2d 493, 494 (D.C.Cir.1959), NextWave asks us to “dismiss the filing that relies on the incorrect jurisdictional provision.” Appellants’ Opening Br. at 1.
In Mobile Communications Corp. of America v. FCC, we decided that the term “station license” in section 402(b) encompasses PCS licenses. See 77 F.3d 1399, 1403 (D.C.Cir.1996); see also 47 U.S.C. § 153(42) (defining “station license” as “that instrument of authorization required ... for the use or operation of apparatus for transmission of energy, or communications, or signals by radio”); id. § 153(33) (defining “communication by radio” as “the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds”). Given this, we think section 402(b)’s plain language, permitting appeal by “the holder of any ... station license which has been ... revoked by the Commission,” covers this case. Cf. Cook, Inc. v. United States, 394 F.2d 84, 86 n. 4 (7th Cir.1968) (“ ‘The language of [subsection 402(b) ], when considered in relation to that of subsection (a) ... would make clear that judicial review of all cases involving the exercise of the Commission’s radio-licensing power is limited to [the United States Court of Appeals for the District of Columbia Circuit].’ ”) (quoting S.Rep. No. 82-44, at 11 (1951)); In re FCC, 217 F.3d at 140-41. Even if the Commission did not formally “revoke” NextWave’s licenses, that is certainly the effect of the license cancellation: the licenses once assigned to NextWave are now being re-auctioned to other bidders. Cf. In re FCC, 217 F.3d at 140 n. 10. We therefore dismiss the section 402(a) petition and proceed with the section 402(b) appeal.

*141
Timeliness

Section 402(c) of the Communications Act requires appeals under section 402(b) to be filed “within thirty days from the date upon which public notice is given of the decision or order complained of.” 47 U.S.C. § 402(c). The “decision” Nex-tWave seeks to challenge is the Commission’s cancellation of its licenses, but the formal Commission action it actually appeals is the public notice of re-auction, which itself cancels no licenses, but rather announces in passing that the company’s licenses canceled automatically at an earlier date. Order on Reconsideration, FCC 00-355 ¶ 10.
The Commission acknowledges that “in some instances, it may be proper for a party to challenge the Commission’s public notices that establish or deny rights.” Id. Joined by Intervenors, however, it argues that NextWave’s challenge to the license cancellation policy is untimely. Interve-nors claim that NextWave should have challenged the policy when its licenses were issued, since the licenses themselves stated explicitly that they were conditioned on timely payment, and as we have held, “[a]cceptance of a license constitutes accession to all [license] conditions.” P&R Temmer v. FCC, 743 F.2d 918, 928 (D.C.Cir.1984). Alternatively, both Inter-venors and the Commission suggest that NextWave should have challenged the automatic cancellation rule during the Restructuring Order proceedings because during those proceedings, the Commission considered objections to its original installment payment plan (including some objections based on the Bankruptcy Code), revised the plan, and ultimately reaffirmed the timely payment requirement. Interve-nors’ Br. at 3; see also, e.g., Order on Recons, of the Second Report and Order, 13 FCC Red 8345 ¶ 24. Having failed to challenge the automatic cancellation rule at one of these earlier dates, they argue, NextWave cannot do so now because orders denying reconsideration do not reopen matters that should have been challenged previously. See ICC v. Bhd. of Locomotive Eng’rs, 482 U.S. 270, 279-80, 285-86, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987).
As NextWave points out, however, we have held that “a party against whom a rule is applied may, at the time of application, pursue substantive objections to the rule ... even where the petitioner had notice and opportunity to bring a direct challenge within statutory time limits” but failed to do so. Indep. Cmty. Bankers of Am. v. Bd. of Governors of the Fed. Reserve Sys., 195 F.3d 28, 34 (D.C.Cir.1999). Thus even if NextWave could have challenged the automatic cancellation policy at an earlier date — either when its licenses issued or during the Restructuring Order proceedings — the company remained free to do so “within thirty days from the date upon which public notice [was] given” that the policy had been applied to it. 47 U.S.C. § 402(c).
According to NextWave, the thirty-day period was triggered by the public notice of re-auction because, prior to the re-auction notice, “the FCC had done nothing whatsoever to announce the cancellation of NextWave’s licenses.” Appellants’ Reply Br. at 6. Because it filed a precautionary appeal with this court 30 days after the notice of re-auction, NextWave claims, its appeal was timely. Disagreeing, Interve-nors argue that NextWave already had notice in October 1998 that its licenses would cancel automatically if and when it failed to make an installment payment. Thus, they argue, no further Commission statement was required to trigger the period for seeking judicial review.
Intervenors’ argument assumes that notice of a future event’s automatic effect (here, the explicit warning that the licens *142 es would cancel for failure to make a timely payment) is by itself sufficient notice to mean that the occurrence of the future event (failing to make a timely payment) will trigger the period for seeking judicial review under section 402(c). To resolve the timeliness issue in this case, however, we need not decide whether that assumption is correct, for we think it was unclear prior to the notice of re-auction that the automatic cancellation policy would apply to licensees who had filed for bankruptcy. To begin with, the Bankruptcy Code gave NextWave reason to doubt that the automatic cancellation would actually occur when the company missed its first payment in October 1998: the automatic stay triggered by a Chapter 11 filing generally blocks most efforts by creditors to exercise control over or repossess property of a debtor. See 11 U.S.C. § 362(a); cf. Nex-tWave VI, 244 B.R. at 266-68 (finding that the automatic stay applied to NextWave’s license fee obligations). Neither the Commission nor Intervenors point to any instance prior to the re-auction notice in which the Commission actually announced that NextWave’s licenses had canceled despite the stay. Moreover, the Commission’s own conduct suggests that it was at best unsure whether the automatic stay blocked cancellation of the company’s licenses. After the bankruptcy ' court’s fraudulent conveyance holding, and several months after NextWave missed the October payment deadline, the Commission moved the bankruptcy court to lift the stay “so that the ... automatic cancellation provisions may take effect.” Mot. to Lift Automatic Stay at 2, NextWave V, 235 B.R. 314 (No. 98 B 21529). And in the bankruptcy court, Commission counsel suggested that the automatic stay blocked cancellation of NextWave’s licenses, stating for example that although “[t]he regulations provide that upon failure to make the payments the license is automatically canceled[,] ... [t]hat hasn’t [happened] in this case due to the automatic stay.” See Hearing Tr. at 30, In re NextWave Pers. Communications, Inc., No. 98 B 21529 (Bankr.S.D.N.Y. Nov. 12, 1998); Nex-tWave VI, 244 B.R. at 277 (noting that transcript erroneously attributes this quotation to the Court).
These circumstances suggest that the Commission believed NextWave’s licenses had not canceled prior to the notice of re-auction. At the very least, they created doubt about the matter, and as we have held, “when an agency leaves room for genuine and reasonable doubt as to the applicability of its orders or regulations, the statutory period for filing a petition for review is tolled until that doubt is eliminated.” Recreation Vehicle Indus. Ass’n v. EPA 653 F.2d 562, 569 (D.C.Cir.1981). Because “genuine and reasonable doubt” about the status of NextWave’s licenses continued until the Commission issued the notice of re-auction, we conclude that Nex-tWave’s petition is timely.

Res Judicata

This brings us to the final and most difficult threshold issue: whether Nex-tWave’s Bankruptcy Code arguments are barred by res judicata. “The doctrine of res judicata prevents repetitious litigation involving the same causes of action or the same issues.” I.A.M. Nat’l Pension Fund v. Indus. Gear Mfg. Co., 723 F.2d 944, 946 (D.C.Cir.1983). According to the Commission, because NextWave litigated and lost its Bankruptcy Code arguments in the Second Circuit mandamus proceedings, it may not relitigate them here. Asserting a right to make these arguments here, Nex-tWave argues that the Second Circuit’s decision was jurisdictional — a decision about “where NextWave’s bankruptcy challenges should be decided, not how they should be resolved.” Appellants’ Opening *143 Br. at 26 (emphasis added). As a result, the company argues, res judicata does not bar it from presenting its Bankruptcy Code arguments in this court.
The doctrine of res judicata “usually is parsed into claim preclusion and issue preclusion.” I.A.M. Nat’l Pension Fund, 723 F.2d at 946. Because the Commission raises arguments based on both theories, and because the two theories differ in subtle but significant respects, we consider each separately. “Under the claim preclusion aspect of res judicata, a final judgment on the merits in a prior suit involving the same parties or their privies bars subsequent suits based on the same cause of action.” Id. at 946-47. Claim preclusion prevents parties from relitigating issues they raised or could have raised in a prior action on the same claim. See Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). “[Djismissals for lack of jurisdiction,” however, “are not decisions on the merits and therefore have no [claim preclusive] effect on subsequent attempts to bring suit in a court of competent jurisdiction.” Kascip v. Folger Nolan Fleming & Douglas, Inc., 166 F.3d 1243, 1248 (D.C.Cir.1999); see also Fed R. Civ. P. 41(b) (“a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, ... operates as an adjudication upon the merits”).
No one disputes that the Second Circuit thought the bankruptcy court lacked authority to declare the notice of reauction invalid. In re FCC, 217 F.3d at 141. The question dividing the parties is why the Second Circuit thought this. According to NextWave, the Second Circuit reversed the bankruptcy court because under section 402 of the Communications Act, “the FCC’s licensing decisions are subject to the exclusive jurisdiction of the federal courts of appeals.” Id. at 129. In other words, the company claims, the Second Circuit held that any arguments directly or collaterally challenging the Commission’s regulatory actions — including arguments based on the Bankruptcy Code — must be brought in a court of appeals. Cf. In re NextWave, 200 F.3d at 55. The Commission has a different view of the Second Circuit’s decision. It argues that the Second Circuit decided not that the bankruptcy court lacked jurisdiction to determine whether the license cancellation violated the Bankruptcy Code, but rather that “the [Bankruptcy Code] provisions on which NextWave relies do not reach regulatory actions such as those at issue here.” Ap-pellee’s Br. at 15. In other words, the Commission claims that the Second Circuit reviewed the bankruptcy court’s Bankruptcy Code conclusions on the merits and found that because the Commission’s actions were regulatory, the automatic stay, right to cure, and antidiscrimination provisions of the Code did not reach those actions.
We agree with NextWave’s interpretation of the Second Circuit’s decision. As we read that decision, the court principally held that the Commission’s license cancellation was a regulatory act reviewable only by a court of appeals under section 402 of the Communications Act, and thus that the bankruptcy court lacked jurisdiction to apply the Code to these acts. With one exception (which we shall explain later), we do not understand the Second Circuit to have decided as a substantive matter that nothing in the Bankruptcy Code prevents the Commission from canceling NextWave’s licenses.
To begin with, and most obviously, the Second Circuit repeatedly stated that it was making a “jurisdictional” decision based on section 402. Here are just three examples: “We recognized that pursuant to ... 47 U.S.C. § 402, review of the *144 FCC’s regulatory decisions and orders is entrusted solely to the federal courts of appeals and is therefore outside the jurisdiction of the bankruptcy and district courts,” In re FCC, 217 F.3d at 131 (describing initial opinion); “ ‘[b]eeause jurisdiction over claims brought against the FCC in its regulatory capacity lies exclusively in the federal courts of appeals, see ... 47 U.S.C. § 402, the bankruptcy and district courts lacked jurisdiction to decide the question of whether NextWave had satisfied the regulatory conditions placed by the FCC upon its retention of the Licenses,’ ” id. at 137 (quoting initial opinion); “[exclusive jurisdiction to review the FCC’s regulatory action lies in the courts of appeals,” id. at 139 (citing cases discussing section 402). Reinforcing the jurisdictional nature of its opinion, the Second Circuit also disavowed any intent to rule on the merits of NextWave’s challenges to the Commission’s acts, stating explicitly that NextWave was “free to pursue its challenge to the FCC’s regulatory acts” in an appropriate forum, id. at 140, and that the court was making “no comment on the prospects” of such an appeal. Id. at 129; see also id. at 138 n. 8 (“we have no occasion to opine on whether the Public Notice is valid or whether the Licenses automatically canceled at some pri- or date”); id. at 139 (“Even if the bankruptcy court is right on the merits of its arguments against revocation — we have no occasion to express an opinion — it is without power to act on its determination.”).
According to the Commission, these repeated references to the bankruptcy court’s lack of jurisdiction mean only that the bankruptcy court lacked jurisdiction to decide whether the Commission had applied the auction requirements of section 309(j) of the Communications Act arbitrarily and capriciously, not that it lacked jurisdiction to review the Commission’s actions for compliance with the Bankruptcy Code. Likewise, the Commission suggests, the Second Circuit’s references to the prospects of NextWave’s appeal refer only to an appeal based on section 309(j). In support of this interpretation, the Commission points to language in the Second Circuit’s opinion suggesting that the bankruptcy court lacked jurisdiction to question the Commission’s regulatory judgments under section 309(j). See, e.g., id. at 131-32 (“ ‘[Ejven if the bankruptcy and district courts were right in concluding that granting the Licenses at a small fraction of NextWave’s original successful bid price best effectuated the [Federal Communication Act’s] goals, they were utterly without the power to order that NextWave be allowed to retain them for that reason or on that basis.’ ”) (quoting initial opinion); see also id. at 136-37.
The Second Circuit, however, had good reason to address section 309(j) directly: the bankruptcy court devoted several paragraphs to evaluating the Commission’s conduct in light of that section. See Nex-tWave VI, 244 B.R. at 271, 281-83. Moreover, it is perfectly consistent to hold that section 402 prohibits the bankruptcy court from reviewing Commission action both under section 309(j) and under the Bankruptcy Code. True, as the Commission points out, other circuits have recognized the jurisdiction of bankruptcy courts to determine whether provisions of the Code such as the automatic stay apply to agency actions. See, e.g., Word v. Commerce Oil Co. (In re Commerce Oil Co.), 847 F.2d 291 (6th Cir.1988); Universal Life Church, Inc. v. United States (In re Universal Life Church, Inc.), 128 F.3d 1294 (9th Cir.1997). But that is irrelevant to the question we face here: how did the Second Circuit view the bankruptcy court’s jurisdiction? Regardless of how other circuits — or even we — might interpret section 402, we think the Second Circuit construed the provision *145 to confer “exclusive jurisdiction” on courts of appeals to review even Bankruptcy Code challenges to the Commission’s regulatory acts. Many of the court’s references to section 402 are not clearly restricted to bankruptcy court power under section 309(j). See, e.g., In re FCC, 217 F.Bd at 139 (“Exclusive jurisdiction to review the FCC’s regulatory action lies in the courts of appeals.”). And at least once in its opinion, the Second Circuit expressly stated that “[t]he bankruptcy court lacked jurisdiction to declare the Public Notice [of reauction] null and void on [the] ground[s] that the Public Notice violated the automatic stay, [or] that the right to cure obviates any default” — that is, on Bankruptcy Code grounds. Id. at 139 (emphasis added).
The Second Circuit’s reasoning in granting mandamus further illustrates the jurisdictional nature of its opinion. The court overturned the bankruptcy court’s decision on two “independently sufficient” grounds, each discussed in a separate section of the opinion. See id. at 141. One ground was that the bankruptcy court lacked “statutory jurisdiction” to nullify the Commission’s license cancellation. Id. Entitled “Jurisdiction,” this section of the opinion consists entirely of a discussion of sections 402(a) and (b) of the Communications Act — it never mentions the Bankruptcy Code. Id. at 139^11. If, as the Commission maintains, the Second Circuit thought the bankruptcy court lacked authority to invalidate the license cancellation principally because the Code does not reach the Commission’s regulatory acts (and if, as the Commission also maintains, the Second Circuit’s discussion of “jurisdiction” merely refers to the peripheral issue of the bankruptcy court’s jurisdiction to review Commission actions under section 309(j) of the Communications Act) it is difficult to explain why the court failed to discuss the Bankruptcy Code in this section of its opinion, given that the reasons discussed here provide an “independently sufficient” basis for mandamus.
The Second Circuit’s other reason for granting mandamus was that the bankruptcy court violated the appellate court’s earlier mandate. But as the Second Circuit made clear, its initial opinion too was jurisdictional:
Our extraordinary mandamus power has two purposes: to achieve compliance with the terms and spirit of our mandates, and to constrain inferior courts to proper exercises of their jurisdiction. In this case, the two uses of mandamus overlap and reinforce one another. This Court’s previous opinion reversed a decision of the bankruptcy court on the ground that that court lacked jurisdiction. The bankruptcy court again seeks to control the FCC’s allocation of licenses, notwithstanding this Court’s express holding that “the bankruptcy and district courts lack[ ] jurisdiction to decide the question of whether NextWave had satisfied the regulatory conditions placed by the FCC upon its retention of the Licenses.” Thus a writ of mandamus protecting this Court’s mandate also confines the inferior court to the lawful exercise of its jurisdiction.
Id. at 137 (quoting In re NextWave, 200 F.3d at 54).
To be sure, in the “mandate” section of its opinion, the Second Circuit appeared to decide on the merits that at least some parts of the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362, do not apply to the facts of this case. See In re FCC, 217 F.3d at 138 (“Undoubtedly, the [Commission] is a governmental unit that is seeking ‘to enforce’ its ‘regulatory power’ [under subsection 362(b)(4) ].”); id at 138 n. 8 (“[W]e hold that the FCC’s regulatory decisions fall within [subsection] *146 362(b)(4).”). But leaving aside for the moment the effect of this discussion under the doctrine of issue preclusion, this portion of the Second Circuit’s opinion does not change our view that the court’s decision was primarily jurisdictional, for the court expressly couched its discussion of the automatic stay in jurisdictional terms: the court prefaced its discussion by noting that “[t]he bankruptcy court founds its jurisdiction [to interfere with the FCC’s enforcement of its payment schedule] chiefly on the automatic stay provision of [section 362]Id. at 138 (emphasis added). We need not decide whether this jurisdictional interpretation of section 362 is correct — the Supreme Court has declined to express an opinion on the issue, see Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc., 502 U.S. 32, 41 n. 11, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991)— because the Commission’s res judicata argument requires only that we determine what the Second Circuit meant, and here we think it clear that the court treated section 362 as though it provided a potential basis for bankruptcy court jurisdiction.
In addition to this direct evidence of the jurisdictional nature of the Second Circuit opinion, the Commission’s alternate view of the opinion — that the court decided as a substantive matter that nothing in the Bankruptcy Code prevents the Commission from canceling NextWave’s licenses— is implausible. Not only does this interpretation fail to account fully for the opinion’s jurisdictional language, see supra at 2122, but the Second Circuit never actually states that the Bankruptcy Code as such does not reach the Commission’s regulatory acts: the entire opinion concerns the power and jurisdiction of the bankruptcy court. Perhaps most telling, the Second Circuit does not discuss any provision of the Bankruptcy Code besides section 362, despite the fact that the bankruptcy court discussed section 525 and made a ruling based on sections 1123 and 1124. As Nex-tWave argues, “[t]he exclusively jurisdictional character of the Second Circuit’s ruling provides a complete explanation for its ... silence respecting NextWave’s principal bankruptcy arguments.” Appellants’ Reply Br. at 4.
Faced with the Second Circuit’s silence about sections 525 and 1123, the Commission suggests that even though the court failed to mention these provisions, it necessarily decided that they do not bar the license cancellation because “mandamus relief is warranted only where the petitioner has demonstrated that its right to such relief is clear and indisputable,” and “the Second Circuit would not have granted our request for extraordinary relief if it had thought that the bankruptcy court’s decision was sustainable on the basis of [section] 525” or 1123. Appellee’s Br. at 21 n.13 (internal quotation omitted); id. at 24 n. 15. The assumption that the Second Circuit “necessarily” resolved these arguments, however, is valid only if the Commission’s view of the case is correct — that is, if the Second Circuit meant to decide as a substantive matter that the Bankruptcy Code did not reach the Commission’s actions. If instead the Second Circuit principally decided, as much of the opinion’s language suggests, see supra at 20-22, that the bankruptcy court lacked jurisdiction to hear these arguments, that conclusion would also have provided a basis for mandamus, without requiring the court to consider or decide anything about sections 525 and 1123 at all.
The Commission offers a second, equally unpersuasive explanation for the Second Circuit’s silence regarding sections 525 and 1123. The bankruptcy court’s analysis of those provisions, the Commission says, “hinges on its characterization of the FCC as an ordinary creditor,” Appellee’s Br. at 24, and by rejecting decisively this charac *147 terization, the Second Circuit in effect decided that these parts of the Code do not apply. Apart from the fact that it seems odd that the Second Circuit would have decided that sections 525 and 1123 do not apply without ever mentioning them, this argument fails because, like the previous argument, it assumes the correctness of the Commission’s reading of the Second Circuit’s opinion. But the alternate reading of the opinion — that the bankruptcy court lacked jurisdiction to hear challenges to the Commission’s regulatory actions based on the Bankruptcy Code or otherwise — also relies upon the notion that the Commission is not an ordinary creditor but a regulator in this situation. The fact that the Second Circuit decided that the Commission was not acting as an ordinary creditor when it canceled the licenses thus does not indicate that the court implicitly decided that sections 525 and 1123 are inapplicable to this case.
Having thus concluded that the Second Circuit’s opinion was jurisdictional and that claim preclusion does not bar NextWave from re-litigating its Bankruptcy Code arguments in this court, we turn to the Commission’s second major .res ju-dicata argument: that each of Nex-tWave’s Bankruptcy Code arguments is barred by issue preclusion. “Under the issue preclusion aspect of res judicata, a final judgment on the merits in a prior suit precludes subsequent relitigation of issues actually litigated and determined in the prior suit, regardless of whether the subsequent suit is based on the same cause of action.” I.A.M. Nat’l Pension Fund, 723 F.2d at 947. Issue preclusion is most often invoked where “a subsequent action is brought on a different claim,” id. at 947 n. 3, and as a result claim preclusion does not apply. Issue preclusion, however, may also apply to subsequent actions brought on the same claim: if a judgment “does not preclude relitigation of all or part of the claim on which the action was brought” — if, for example, as here, the judgment was jurisdictional — it may still preclude relitigation of any issues “actually litigated and determined” in the first action. Id. For issue preclusion to apply, however, “the issue must have been actually and necessarily determined by a court of competent jurisdiction in the first trial.” Connors v. Tanoma Mining Co., 953 F.2d 682, 684 (D.C.Cir.1992) (internal quotation and emphasis omitted). If the “basis” of a prior decision is “unclear, and it is thus uncertain whether the issue was actually and necessarily decided in [the prior] litigation, then relitigation of the issue is not precluded.” Id.
It may appear that the only issue potentially barred by issue preclusion from a case dismissed for lack of jurisdiction is the jurisdictional determination itself. Cf. Kasap, 166 F.3d at 1248. In this case, it may thus seem that the Second Circuit cannot have ruled on the merits of any of NextWave’s Bankruptcy Code arguments, because the court only decided that the bankruptcy court lacked jurisdiction to hear them. And indeed, under our jurisdictional interpretation of the Second Circuit’s decision, we do not think the court “actually and necessarily” decided whether sections 525 and 1123 bar the license cancellation. We thus conclude that issue preclusion does not bar relitigation of these issues.
Far less clear, however, is whether issue preclusion bars NextWave’s section 362 argument. As we have seen, the Second Circuit explicitly discussed section 362’s automatic stay, finding that the bankruptcy court could not rely on the provision as an independent basis for jurisdiction because the license cancellation was a regulatory act exempt under sub *148 section 362(b)(4). See supra at 23-24. It is true, as we have said, that this was a jurisdictional discussion, but this does not preclude it from having issue preclusive effect: if a court makes a substantive determination in order to arrive at a jurisdictional holding, the substantive determination can have issue preclusive effect so long as it was “actually litigated and determined in the prior action.” See I.A.M. Natl Pension Fund, 723 F.2d at 947 n. 3. The Restatement gives the following example:
A brings an action against B for personal injuries arising out of an automobile accident. Jurisdiction is asserted over B, a nonresident, on the basis that the automobile involved in the accident was being operated in the state by or on his behalf. After trial of this issue, the action is dismissed for lack of jurisdiction. In a subsequent action by A against B for the same injuries, brought in the state of B’s residence, the prior determination that the automobile was not being operated by or on behalf of B is conclusive.
Restatement (Seoond) op Judgments § 27, illustration 3 (1980).
Here, the Second Circuit appears to have decided that section 362 does not confer jurisdiction on the bankruptcy court because subsection 362(b)(4)’s “regulatory power” exception applies as a substantive matter. We thus agree with the Commission that issue preclusion bars NextWave from relitigating the question of whether the license cancellation falls within subsection 362(b)(4). The Second Circuit spoke clearly and unequivocally about this issue, stating that “[ujndoubtedly, the FCC is a governmental unit that is seeking ‘to enforce’ its ‘regulatory power,’ ” In re FCC, 217 F.3d at 138, and that “we hold that the FCC’s regulatory decisions fall within [subsection] 362(b)(4).” Id. at n. 8. And under the Second Circuit’s jurisdictional reading of section 362, this decision was necessary to the case: if subsection 362(b)(4) did not apply, section 362 could have provided a basis for the bankruptcy court to assert jurisdiction over the license cancellation. In considering NextWave’s Bankruptcy Code arguments, see Section III infra, we will thus assume that the license cancellation falls within the regulatory power exception to the automatic stay.
We are less sure, however, that the Second Circuit “actually and necessarily” decided as part of its jurisdictional decision that all provisions of section 362 do not apply to the license cancellation. In particular, as the Second Circuit implicitly acknowledged, subsection 362(b)(4)’s “regulatory power” exception does not apply to subsections 362(a)(4) and (5), which stay actions to enforce liens. See In re FCC, 217 F.3d at 138. Although the bankruptcy court thought the cancellation of Nex-tWave’s licenses “unarguably violate[d]” these subsections, NextWave VI, 244 B.R. at 267, and explicitly quoted the language in the security agreements creating a “first lien on and continuing security interest in” the licenses, id. at 267 n. 7, the Second Circuit, in a footnote, simply observed: “Subsections (4) and (5) are concerned with liens. The bankruptcy court does not explain why they are implicated here.” In re FCC, 217 F.3d at 138 n. 7. Thus, unlike in its subsection 362(b)(4) discussion, the Second Circuit never said it was “hold[ing]” that subsections 362(a)(4) and (5) do not apply to the cancellation of NextWave’s licenses. Cf. id. at 138 n. 8. Instead, the court merely observed that the bankruptcy court did not explain why they are implicated. It is thus unclear whether the Second Circuit decided that subsections 362(a)(4) and (5) do not block cancellation of NextWave’s licenses, or whether it simply concluded that it had no *149 need to reach the issue because the bankruptcy court failed adequately to address it. Since under our decision in Connors, if it is “uncertain whether [an] issue was actually and necessarily decided in [prior] litigation, then relitigation of the issue is not precluded,” 953 F.2d at 684, we conclude that NextWave is not barred from arguing that subsections 362(a)(4) and (5) prohibit cancellation of its licenses.
Having resolved these threshold issues, we turn to the merits of NextWave’s appeal.
Ill
NextWave argues that the Commission’s cancellation of its licenses violated sections 525,1123, and 362 of the Bankruptcy Code. Under the Administrative Procedure Act, we must “hold unlawful and set aside agency action ... found to be ... not in accordance with law [or] ... in excess of statutory jurisdiction, authority, or limitations.” 5 U.S.C. § 706(2). This provision requires us to invalidate agency action not only if it conflicts with an agency’s own statute, but also if it conflicts with another federal law. See, e.g., Scheduled Airlines Traffic Offices, Inc. v. Dept. of Def., 87 F.3d 1356, 1361 (D.C.Cir.1996) (applying 5 U.S.C. § 706(2)(A) and declaring Department of Defense policy invalid under Miscellaneous Receipts statute); see also Cousins v. Sec’y of the U.S. Dept. of Transp., 880 F.2d 603, 608 (1st Cir.1989) (stating that the quoted passages from section 706 are “general in their meaning” and “do not restrict the courts to consideration of the agency’s own enabling statute”).
We begin with section 525:
[A] governmental unit may not deny, revoke, suspend, or refuse to renew a license ... or other similar grant to, ... discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is ... a bankrupt or a debtor under the Bankruptcy Act ... solely because such bankrupt or debtor ... has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.
11 U.S.C. § 525(a). No one disputes that the Commission is a “governmental unit” that has “revoke[d]” a license for purposes of section 525, nor that NextWave is a “bankrupt or a debtor under the Bankruptcy Act.” Pointing to the fact that the Commission has filed proofs of claim in bankruptcy court based on its security interests in PCS licenses, see, e.g., Proof of Claim, In re NextWave Pers. Communications, Inc., No. 98 B 21529 (Bankr.S.D.N.Y. Dec. 16, 1998) (filed on behalf of creditor The United States of America), NextWave argues that the installment payment obligations were dischargeable debts under the Bankruptcy Code. See 11 U.S.C. § 1141(d) (stating that dischargea-ble debts under Chapter 11 generally include “any debts that arose before the date of ... confirmation” of the debtor’s reorganization plan). And because failure to make installment payments was the “sole triggering mechanism” for automatic cancellation, NextWave continues, its licenses canceled “solely because” it failed to pay dischargeable debts. Appellants’ Reply Br. at 8.
The Commission never denies that if NextWave had made its payments, the company could have retained its licenses. Nor does the Commission dispute that NextWave’s license fee obligations were at least in part genuine, enforceable debts— indeed, the Commission’s own regulations provide for their collection if left unpaid. See 47 C.F.R. § 1.2110(g)(4)(iv) (“A licensee in the PCS C or F [B]locks shall be in default, its license shall automatically can *150 cel, and it wül be subject to debt collection procedures, if the payment due on the payment resumption date ... is more than ninety (90) days delinquent”) (emphasis added). Instead, the Commission offers a series of unpersuasive arguments intended to demonstrate why, notwithstanding section 525’s apparent applicability, the provision does not bar cancellation of Nex-tWave’s licenses.
First, the Commission urges us to read section 525 in light of section 362. The latter section, the Commission suggests, “serves the important purpose of providing a debtor with some breathing room in the situations to which it applies. Accordingly, [section] 362 should be broader than [section] 525, providing for breathing room even in some situations where cancellation ultimately would be permitted.” Appel-lee’s Br. at 21-22. Thus, the Commission argues, because (on its reading) the automatic stay does not apply to this case, section 525 should not apply either. Fleshing out this argument, Intervenors suggest that “[i]t would make little sense for Congress to exempt governmental ‘regulatory’ actions from the stay [under subsection 362(b)(4) ] but then flatly forbid them in [section] 525. Basic structural coherence requires the conclusion that [section] 525 does not prevent a license cancellation already correctly found exempt from the stay as regulatory.” Inter-venors’ Br. at 18.
This is an interesting argument, but it fails for several reasons. To begin with, it is inconsistent with section 525’s plain language. Section 525 clearly and explicitly prohibits governmental units, for whatever reason, from canceling licenses for failure to pay a dischargeable debt: “a governmental unit may not ... revoke ... a license ... to ... a bankrupt ... solely because such bankrupt ... has not paid a debt that is dischargeable ... under this title.” 11 U.S.C. § 525(a). Nothing in section 525 or 362 states that section 525 is subject to subsection 362(b)(4)’s regulatory power exception, or that the exception should be read to limit section 525’s clear reach. Thus, while interpretation of the Bankruptcy Code is a “holistic endeavor,” and “[a] provision that may seem ambiguous in isolation” can often be “clarified by the remainder of the statutory scheme,” United Sav. Ass’n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), here we see no such ambiguity. Various bankruptcy and district courts, accordingly, have held that section 525 can apply even if the automatic stay does not. See, e.g., William Tell II, Inc. v. Illinois Liquor Control Comm’n (In re William Tell II, Inc.), 38 B.R. 327, 330 (N.D.Ill.1983) (“even if a state proceeding is not automatically stayed, a bankruptcy court has authority to enjoin certain conduct under 11 U.S.C. § 525”); In re The Bible Speaks, 69 B.R. 368, 373 n. 5 (Bankr.D.Mass.1987) (“[Section] 525(a) is directed at governmental units and may apply even where the automatic stay has no effect.”).
Moreover, contrary to Intervenors’ argument, this interpretation of section 525 does not render the Code “structurally] [in]coheren[t].” Though this reading does mean that an action exempted under subsection 362(b)(4) might nonetheless be barred by section 525, it does not render subsection 362(b)(4) meaningless, because that subsection covers a different and wider variety of actions than section 525. For example, subsection 362(b)(4) exempts from the automatic stay (among other things) “any act” by a governmental unit to “obtain possession of property of the estate ... or to exercise control over property of the estate,” so long as the act is taken to enforce the unit’s “regulatory power.” 11 U.S.C. § 362(a)(3), (b)(4) (emphasis added). Section 525, in contrast, *151 prohibits governmental units only from taking certain specific actions with respect to an extremely limited subset of a debt- or’s property — licenses and similar grants — or with respect to employment opportunities.
Even if the Commission were correct that section 525 should be read to permit all actions exempted from the automatic stay by subsection 362(b)(4), that argument would be inapplicable to this case because subsection 362(b)(4) does not apply to the stay of acts to “create, perfect, or enforce” liens against property of the estate or of the debtor imposed by subsections 362(a)(4) and (5). Here, NextWave executed security agreements giving the Commission a “first lien” on the company’s interest in the licenses, and under subsections 362(a)(4) and (5), “a creditor holding a lien on property of the estate may not enforce the lien by seizure, foreclosure, or otherwise.” 3 CollieR on Bankeuptcy ¶ 362.03[6] (15th ed. rev.2000). Stayed actions include “self-help remedies against collateral” such as “repossession.” Id. ¶ 362.03[6] [b ]. Before the bankruptcy court, Commission counsel acknowledged that canceling the licenses and seeking to collect on the debt was “tantamount ... to foreclosing on collateral.” Hearing Tr. at 14, In re NextWave Pets. Communications, Inc., No. 98 B 21529 (Bankr. S.D.N.Y. May 26,1999). Thus, contrary to the Commission’s argument, and notwithstanding the applicability of the regulatory power exception, section 362’s automatic stay does apply here. This is thus not a ease in which section 525, if applicable, would bar an action exempt from the automatic stay.
The Commission next argues that section 525 is inapplicable because Nex-tWave’s license fee obligation was not a “dischargeable” debt. In support of this proposition, the Commission offers two arguments. First, it claims that the New York bankruptcy court could not have discharged NextWave’s debt because the Second Circuit, whose decisions are binding on that court, held in its initial opinion that so long as NextWave retained its licenses, its payment obligation was subject to neither modification nor discharge in bankruptcy. As a result, the Commission concludes, the payment obligation was not a debt “dischargeable” in bankruptcy while the license was held.
We disagree. To begin with, it is unclear that the Second Circuit in fact thought the bankruptcy court lacked power to alter or discharge the payment obligation while NextWave held the licenses. Though parts of its initial opinion do suggest this, see In re NextWave, 200 F.3d at 56, other parts suggest that the court simply thought the bankruptcy court had no authority to require the Commission to allow NextWave to keep its licenses after modification of its payment obligation. See, e.g., id. at 54 (“It is beyond the jurisdiction of a court in a collateral proceeding to mandate that a licensee be allowed to keep its license despite its failure to meet the conditions to which the license is subject.”). If the latter reading is correct, then insofar as NextWave’s payment obligation was a debt (as opposed to a license condition), it was dischargeable by the bankruptcy court. Even if the Commission’s reading of the Second Circuit’s opinion is correct, the Commission’s argument assumes that the phrase “debt that is dis-chargeable ... under this title” in section 525(a) refers to the bankruptcy court’s power to modify or discharge a payment obligation. The provision’s plain language, however, refers to a payment obligation that can be modified or discharged under the Bankruptcy Code; and as we read the Second Circuit’s opinion, the court merely decided that insofar as timely payment was a condition for license retention, the *152 bankruptcy court had no authority to modify it. It never decided that a court of competent jurisdiction (such as this one) could not modify or discharge it under section 525.
The Commission also argues that because “[a] licensee’s full and timely payment of its winning bid installments is an essential condition of its license grant[,] [p]ayment ... is a regulatory requirement, not a dischargeable debt.” Appellee’s Br. at 22. At oral argument, Commission counsel conceded that the payment obligation also has the character of a dis-chargeable debt. As we indicated earlier, the Commission could seek to collect its license fee, and in so doing it would be subject (as the Second Circuit held) to the constraints imposed on creditors by the Bankruptcy Code. See In re NextWave, 200 F.3d at 56. But here, the Commission contends, it seeks only to revoke Nex-tWave’s licenses, not to collect on the debt, and insofar as timely payment is a condition of license retention, it is a regulatory requirement, not a dischargeable debt, and section 525 is inapplicable.
As Commission counsel also acknowledged, this claim amounts to a request for a regulatory purpose exception to section 525: the Commission in effect argues that because (for legitimate regulatory motives) it made timely payment a regulatory requirement, it should be permitted to cancel licenses for failure to meet that requirement despite section 525’s plain language (“a governmental unit may not ... revoke ... a license ... to ... a bankrupt ... solely because such bankrupt ... has not paid a debt that is dischargeable ... under this title”). But basic principles of statutory interpretation preclude such a result. To begin with, section 525 contains several exceptions, but none for agencies fulfilling regulatory purposes. See 11 U.S.C. § 525(a) (“Except as provided in the Perishable Agricultural Commodities Act, ... the Packers and Stockyards Act, ... and section 1 of ... ‘An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes’, ... a governmental unit may not deny, revoke, [or] suspend ... a license.... ”). This in itself suggests that Congress did not intend to provide a regulatory purpose exception to section 525. See Tenn. Valley Auth. v. Hill, 437 U.S. 153, 188, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (relying on fact that Endangered Species Act “creates a number of limited ‘hardship exemptions’ ” but none for federal agencies to conclude “under the maxim expressio unius est exclusio alteri-us ... that these were the only ‘hardship cases’ Congress intended to exempt”). Moreover, other parts of the Bankruptcy Code contain explicit regulatory purpose exceptions. Section 362, as we have seen, exempts from certain provisions of the automatic stay any “governmental unit” exercising its “police or regulatory power.” 11 U.S.C. § 362(b)(4). Section 362 also contains a series of narrower exceptions for certain named agencies that have entered lending relationships, allowing them to engage in particular acts of foreclosure and other actions. See, e.g., 11 U.S.C. § 362(b)(8) (exception permitting HUD Secretary to foreclose on certain mortgages insured under the National Housing Act). To us, these express exceptions demonstrate that section 525 contains neither an implied regulatory power exception for governmental units in general nor an implied agency-specific exception allowing the Commission to enforce an automatic cancellation policy pursuant to an installment payment scheme under section 309(j) of the Communications Act. See Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (“Where Congress includes particular language in one section of a statute but omits it in another *153 section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.”) (internal quotation omitted).
Next, Intervenors argue that even if the license fee obligation itself is a dischargea-ble debt, the Commission did not cancel NextWave’s licenses “solely because” of failure to pay that debt. “The ‘solely because’ language,” they argue, “limits the bar on license revocation to circumstances where a government [agency] is simply advancing creditor interests in receiving the money due.” Intervenors’ Br. at 16-17. Since here, license cancellation was intended not to induce payment but instead to “protect!] the integrity of [the] auction!] and select[] the applicant most likely to use the Licenses efficiently for the benefit of the public,” section 525 is not implicated, because “it is not the ‘debt’ character of the defaulted obligation that is the ‘sole’ basis for the cancellation.” Id. (internal quotation omitted).
We are unconvinced. Intervenors argue that “solely because” should be read to mean “solely because of creditor interests in receiving the money due.” But the statute says nothing about an agency’s motives in canceling a license for failure to pay a dischargeable debt — it simply says governmental units may not cancel licenses “solely because” a debtor “has not paid” such a debt. See 11 U.S.C. § 525(a) (emphasis added). It may be true, as the Second Circuit decided, that the Commission had a regulatory motive for examining NextWave’s timely payment record and canceling its licenses on that basis, but as we pointed out earlier, neither the Commission nor Intervenors dispute that Nex-tWave could have retained its licenses if it had made timely installment payments. NextWave’s failure to make its payments was thus the “sole” trigger of the license cancellation, in the sense that the Commission looked to no other factor in determining whether NextWave should retain its licenses; and we think this is exactly the kind of conduct barred by section 525’s plain text. Adopting Intervenors’ intent-based reading of section 525 would allow governmental units to escape section 525’s limitations simply by invoking a regulatory motive for their concern with timely payment, and as we have already explained, section 525 contains no implicit regulatory purpose exception.
To support their view that the phrase “solely because” permits license cancellation based on failure to pay a dischargea-ble debt so long as the cancellation is motivated by a non-pecuniary regulatory purpose, Intervenors point to legislative history stating that section 525 “does not prohibit consideration of ... factors! ] such as future financial responsibility or ability ... if applied nondiscriminatorily,” H.R.Rep. No. 95-595, at 367 (1977), U.S.Code Cong. & Admin.News 1978, 5787; 6322, 6323, and that “in those cases where the causes of the bankruptcy are intimately connected with the license grant ... an examination into the circumstances surrounding the bankruptcy will permit governmental units to pursue appropriate regulatory policies and take appropriate action without running afoul of bankruptcy policy.” Id. at 165, U.S.Code Cong. & Admin.News 1978, at 6126. But these passages do not lead us to conclude that section 525 is inapplicable here. To begin with, we may not “resort to legislative history to cloud a statutory text that is clear.” Ratzlaf v. United States, 510 U.S. 135, 147-48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). Moreover, while the quoted passages do suggest that agencies may make regulatory decisions (including perhaps canceling the licenses of bankrupt debtors) based on factors such as future financial responsibility or ability, they do not state that an agency may use timely payment of *154 a dischargeable debt as the sole indicator of such responsibility, as the Commission has done here. Cf. H.R.Rep. No. 95-595, at 165, U.S.Code Cong. & Admin.News 1978, at 6126 (“The purpose of [section 525] is to prevent an automatic reaction against an individual for availing himself of the protection of the bankruptcy laws.”).
Duffey v. Dollison, 734 F.2d 265 (6th Cir.1984), which Intervenors invoke, reinforces rather than undermines this interpretation of section 525. In Duffey, the court upheld as applied to a bankrupt debtor a state law suspending the driver’s license of anyone who failed to make timely payment of a state tort judgment until that person provided proof of future financial responsibility. The statute at issue there specifically required extrinsic “evidence of financial responsibility,” such as a certificate of insurance or a bond, in order to reinstate a license, and was specifically re-written not to require payment of discharged debts as a precondition for reinstatement: “the registrar shall vacate the order of suspension upon proof that such judgment is stayed, or satisfied in full ... and upon such person’s filing ... evidence of financial responsibility...Id. at 269 (quoting Ohio Rev.Code § 4509.45 (Baldwin 1975)). The Commission’s automatic cancellation policy, in contrast, refers to no analogous extrinsic evidence of fitness to hold a license, and allows license cancellation to rest solely on failure to pay a dischargeable debt.
Finally, noting that section 525 is entitled “Protection against discriminatory treatment,” and that the House Report on the bankruptcy bill provides that section 525 “extends only to discrimination or other action based solely ... on the basis of nonpayment of a debt discharged in the bankruptcy case,” H.R.Rep. No. 95-595, at 366-67, U.S.Code Cong. & Admin.News 1978, at 6322, the Commission suggests that the provision is inapplicable here because “[a]ll licensees lost their licenses if they failed to meet the payment deadline.” Appellee’s Br. at 23.
The text of section 525, however, includes “discriminat[ion]” only as an item in a series of prohibited actions: “a governmental unit may not deny, revoke, suspend, or refuse to renew a license ... to, [or] condition such a grant to, [or] discriminate with respect to such a grant against, [or] deny employment to, [or] terminate the employment of, or discriminate with respect to employment against[ ] a person that is ... a debtor under this title....” 11 U.S.C. § 525(a) (emphasis added). Another prohibited action in the series is (as we have just seen) to “revoke” the license of a bankrupt “solely because such bankrupt” has “not paid a debt dischargeable” under the Bankruptcy Code — precisely what happened in this case. And the House Report itself explicitly states that section 525 “extends only to discrimination or other action based solely ... on the basis of nonpayment of a debt discharged in the bankruptcy case....” H.R.Rep. No. 95-595, at 366-67, U.S.Code Cong. & Admin.News 1978, at 6322 (emphasis added); see also Walker v. Wilde (In re Walker), 927 F.2d 1138, 1142-43 (10th Cir.1991) (invalidating under section 525 a license cancellation policy that applied to bankrupts and non-bankrupts alike).
We have no doubt that in developing its installment payment plan, the Commission made a good faith effort to implement Congress’s command to encourage small businesses with limited access to capital to participate in PCS auctions. We are also mindful that, as the Commission suggests, allowing NextWave to retain its licenses may be “grossly unfair” to losing bidders and licensees who “complied with the administrative process and forfeited licenses or made timely payments despite their *155 financial difficulties.” Appellee’s Br. at 9. Any unfairness, however, was inherent in the Commission’s decision to employ a licensing scheme that left its regulatory actions open to attack under Chapter 11 of the Bankruptcy Code, the very purpose of which is “to permit successful rehabilitation of debtors.” NLRB v. Bildisco & Bildisco, 465 U.S. 513, 527, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); see also H.R.Rep. No.95-595, at 220, U.S.Code Cong. & Admin.News 1978, at 6179 (“The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business’s finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.”). The Code expressly contemplates that bankrupts will sometimes avoid the consequences of late or nonpayment they might have faced had they not filed for bankruptcy. See, e.g., 11 U.S.C. § 1123(a)(5)(G) (stating that a reorganization plan may, among other options, provide for “curing or waiving of any default”); United States v. Whiting Pools, Inc., 462 U.S. 198, 204, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) (“The creditor with a secured interest in property included in the estate must look to [the provisions of the Bankruptcy Code] for protection, rather than to the nonbankruptcy remedy of possession.”). And the Code’s restrictions have been applied even to the official actions of Government agencies. See, e.g., Whiting Pools, 462 U.S. at 209, 103 S.Ct. 2309 (enforcing the Bankruptcy Code against the IRS to prevent seizure of property under a tax lien and concluding that “[njothing in the Bankruptcy Code or its legislative history indicates that Congress intended a special exception for the tax collector”). Here, as we have explained, we think section 525 prevents the Commission, whatever its motive, from canceling the licenses of winning bidders who fail to make timely installment payments while in Chapter 11.
We do not think this conclusion frustrates the purposes of the Communications Act, because nothing in the Act required the Commission to choose the licensing scheme at issue here. Although section 309© suggests the possibility of using guaranteed installment payments of some kind, the statute also suggests alternative methods of facilitating small business participation. See 47 U.S.C. § 309(j)(4)(A). Indeed, in 1998, the Commission decided that “until further notice, installment payments should not be offered in auctions as a means of financing small businesses and other designated entities seeking to secure spectrum licenses.” See Competitive Bidding Proceeding, 63 Fed.Reg. 2315, 2318-19 (Jan. 15, 1998). Moreover, irrespective of the Commission’s decision to use installment payments as part of its licensing scheme, nothing in the Act required it to enter a creditor relationship with winning bidders, take liens on licenses, or — most important for our decision here' — make timely payment a license condition. For example, the Commission could have required winning bidders to obtain third party guarantees for their license fee obligations, or required full upfront payment from C Block licensees and helped them obtain loans from third parties. The Commission could also have made license grants conditional on periodic checks of financial health, a more extensive credit check, or some other evidence that winning bidders were capable of using their licenses in the public interest. Having chosen instead a scheme that put it in a creditor-debtor (and lienholder) relationship with its licensees and conditioned licenses on timely payment of their debts, and having as a consequence run afoul of section 525 of the Bankruptcy Code, the Commission may not escape that provi *156 sion’s clear command simply because it acted for a regulatory purpose.
IV
In view of our conclusion that the Commission violated section 525 of the Bankruptcy Code in canceling NextWave’s licenses, we need not consider NextWave’s remaining Bankruptcy Code arguments, nor its arguments that the cancellation violated principles of due process and fair notice. We therefore reverse and remand to the Commission for proceedings not inconsistent with this opinion.

So ordered.